

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HILDENE CAPITAL MANAGEMENT,
LLC, and HILDENE OPPORTUNITIES
MASTER FUND, LTD. individually and
derivatively,

          Plaintiff,

   -against-

FRIEDMAN, BILLINGS, RAMSEY
GROUP, INC. (d/b/a ARLINGTON ASSET
INVESTMENT CORP.), FBR CAPITAL
TRUST VI, FBR CAPITAL TRUST X,
WELLS FARGO BANK, N.A., and JOHN
AND JANE DOES 1 THROUGH 100

          Defendants,

and WELLS FARGO BANK, N.A., as trustee
for TROPIC III CDO LTD., TROPIC IV
CDO LTD., and SOLOSO CDO 2005-1
LTD.,

          Nominal Defendant.

11 Civ. 5832 (JGK)

**<u>AMENDED COMPLAINT</u>**

**<u>JURY TRIAL DEMANDED</u>**

      Plaintiffs Hildene Capital Management, LLC and Hildene Opportunities Master

Fund, Ltd. (together, "Hildene"), individually and derivatively through nominal defendant Wells

Fargo Bank, N.A. ("Wells Fargo"), as trustee for Tropic III CDO Ltd. ("Tropic III"), Tropic IV

CDO Ltd. ("Tropic IV"), and Soloso CDO 2005-1 Ltd. ("Soloso 2005-1"), by and through its

undersigned attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Complaint against

defendants Friedman, Billings, Ramsey Group, Inc. (d/b/a Arlington Asset Investment Corp.)

("FBR Inc."), FBR Capital Trust VI and FBR Capital Trust X (the "FBR Capital Trusts" and

1

together with FBR, Inc., "FBR"), Wells Fargo and John and Jane Does 1 Through 100, alleges as follows:

<b>INTRODUCTION</b>

1.     This action is brought to seek redress for vulture fund FBR's absconding with the key assets of three investment vehicles, Tropic III, Tropic IV, and Soloso 2005-1 (together, the "CDOs") for pennies on the dollar in breach of the governing agreements by paying cash bribes to the CDOs' most junior stakeholders as inducements for their purported consent to the sales. FBR's scheme was facilitated and hidden from the senior investors by the CDOs' trustee, Wells Fargo, in breach of Wells Fargo's contractual and fiduciary obligations.  As a result of these breaches, the CDOs have been stripped of $35 million in valuable performing assets that secured payments to the CDOs' senior investors (the "Noteholders"), leaving them to suffer unnecessary and unintended losses while FBR and the junior stakeholders enjoyed an ill-gotten windfall.

2.     The CDOs' trustee, Wells Fargo, who had a concealed conflict as trustee for the plaintiff FBR Capital Trusts, has unreasonably failed to take action on behalf of the CDOs (or their investors) to seek redress for losses suffered as a result of these improper sales.  Plaintiff thus brings this action both individually and derivatively through Wells Fargo, as trustee, on behalf of the CDOs themselves.

3.     The CDOs at issue, Tropic III, Tropic IV, and Soloso 2005-1, are structured investment vehicles whose value and payments derive from an underlying portfolio of assets (the "Portfolio Collateral").  The CDOs issued securities split into different classes, or tranches, of which the notes (the "Notes") are the higher rated and lower risk classes that are backed by a first priority security interest in the Portfolio Collateral.  In contrast, the most junior stakeholders (the "Preferred Shareholders") hold only equity in the CDO.  They are not secured by the Portfolio

2

Collateral and are in a "first loss" position, such that if the CDOs' underlying collateral underperforms, they are the first to bear any losses. By 2009, the CDOs had suffered sufficient losses that the Preferred Shareholders no longer had any hope of receiving any further payments on their investment.

4.     The CDOs' Portfolio Collateral, which was unmanaged and intended to remain "static" throughout the life of the CDOs, was primarily comprised of debt securities. At one time, the debt securities in the CDOs' Portfolio Collateral included $35 million of trust preferred securities or "TruPS" that were issued by the FBR Capital Trusts (the "FBR TruPS"). Wells Fargo served as trustee under the declarations of trust pursuant to which the FBR TruPS were issues. FBR, Inc. was the guarantor on the FBR TruPS and was thus the party ultimately responsible for paying the CDOs the full principal amount of $35 million plus periodic interest payments. During the time that the CDOs owned the FBR TruPS, they were performing securities that met all of their payment obligations to the CDOs.

5.     However, over the course of 2009, with the assistance and cooperation of Wells Fargo, FBR embarked on an illegal scheme to extinguish its $35 million in debt to the CDOs through acquiring the FBR TruPS at a deep and impermissible discount. FBR implemented its scheme through a series of written offers to the CDOs' Preferred Shareholders, none of whom were entitled to receive any payments from the CDOs because of distress to the portfolios and the redirection of cash payments to CDO Noteholders pursuant to the structural provisions of the CDOs. Wells Fargo assisted FBR through communicating the offers to the CDOs' Preferred Shareholders while keeping the existence of the offers concealed from the CDOs' Noteholders.

6.     In the offers from FBR that Wells Fargo transmitted to the Preferred Shareholders, FBR purported to "relay a request" by the FBR Capital Trusts to "repurchase"

from the CDOs the $35 million in FBR TruPS.  In relaying the offer, Wells Fargo never disclosed that it was also the trustee for the FBR Capital Trusts and thus had a conflict of interest between its duties to those trusts and its duties to the CDOs.  The aggregate purchase price offered by the FBR Capital Trusts for their TruPS was only $5.25 million — or 15% of the outstanding principal amount of the securities — even though the FBR TruPS were performing securities that had never missed a payment.  However, to the extent that a purported "requisite percentage" of the Preferred Shareholders were willing to direct Wells Fargo to accept this sweetheart deal, the offers also provided that FBR, Inc. — the ultimate guarantor on the FBR TruPS — would pay an additional $1.75 million consent fee directly to the Preferred Shareholders who agreed to approve the discounted sale instead of paying such amount to the legal holders of the securities, the CDOs, who were entitled to all payments (including "consent fees") associated with the debt.  .

7.     After the majority of the Preferred Shareholders communicated their approval of FBR's offer to Wells Fargo, Wells Fargo then facilitated the sale of FBR TruPS to the FBR Capital Trusts for the offered $5.25 million.  As trustee for both the CDOs and the FBR Capital Trusts, Wells Fargo was responsible for both sides of the transaction — making the $5.25 million in payments by the FBR Capital Trusts and receiving the $5.25 million in payments by the CDOs.  Wells Fargo also transmitted the names of the Preferred Shareholders who had approved the offer to FBR, who then sent each of those Preferred Shareholders their pro rata share of the $1.75 million in promised side payment.

8.     This scheme — concocted by FBR and implemented with the necessary assistance of Wells Fargo — resulted in FBR extinguishing $35 million in debt to the CDOs for a small fraction of what FBR rightfully owed.  It also, for the following reasons, amounted to

blatant tortious conduct by FBR and a breach of numerous clear contractual, fiduciary and other duties by Wells Fargo.

9.     *First*, it was a breach of the CDO's governing indentures (the "Indentures"), as there was nothing under the terms of those Indentures that gave the Preferred Shareholders the authority to direct a sale of the FBR TruPS to the FBR Capital Trusts.  To the contrary, the CDOs were created as "static" investment vehicles, with the Indentures prohibiting the sale of Portfolio Collateral except in expressly limited circumstances. While FBR sought to justify the offers pursuant to Section 10.3(d) of the Indentures — which concerns certain situations in which Preferred Shareholders can approve the release assets from a lien once a proper and authorized direction to sell a security has been received by the Trustee — this was merely a pretext since Section 10.3(d) does not provide any affirmative rights to the Preferred Shareholders to "direct the Trustee to sell" Portfolio Collateral as other provisions of the Indenture do under other, inapplicable, circumstances.  The offers were thus in breach of Wells Fargo's contractual duties and were additionally fraudulent on their face since they purported to seek a direction from the Preferred Shareholders even though they had no authority to provide such a direction.

10.    *Second*, even if the Preferred Shareholders had possessed the authority to direct a sale of Portfolio Collateral, the $1.75 million in side payments by FBR to induce the Preferred Shareholders to give that direction constituted illegal bribes.  As both FBR and Wells Fargo knew, since the Preferred Shareholders no longer had any expectation of receiving any income from the CDOs' Portfolio Collateral, they also had no financial incentive to protect the value of the CDOs' Portfolio Collateral.  The $1.75 million was thus a windfall payment intended to bribe the Preferred Shareholders to agree to a sweetheart sale that would allow FBR to abscond with

the valuable Portfolio Collateral for a payment to the CDO equal to 15% of the face amount and without fairly compensating the CDOs.  Wells Fargo's concealed conflict as trustee on both sides of the transaction exacerbated the problem since Wells Fargo held duties to maximize returns to the FBR Capital Trusts that was in direct contravention to the interests of the CDOs.  It was furthermore a breach of the Indentures for the side payments to be made directly to the Preferred Shareholders as the Indentures expressly provide for Wells Fargo to collect all "consent fees" and distribute them pursuant to Priority of Payment provisions to ensure the Noteholders received payments before the Preferred Shareholders, the junior-most equity investors in the CDOs.

11.     *Third*, in addition to being impermissible under the CDOs' Indentures, FBR's offers were also illegal under the terms of the trust declarations pursuant to which FBR's TruPS were issued (the "Trust Declarations").  Those Trust Declarations — which were concealed from the CDOs' investors even after requested by plaintiffs but known to FBR and Wells Fargo as trustee to the FBR Capital Trusts  — expressly restricted the FBR Capital Trusts from redeeming their own TruPS for anything less than 100% of their notional amount.  The FBR Capital Trusts were thus prohibited by the terms of their formational documents from purchasing their own TruPS for 15% of their principal amount.  Moreover, the Trust Declarations also provided that any transfer of the TruPS not made in accordance with the terms of trust declaration — such as the purported repurchase of the TruPS for 15% of their notional amount — would be "null and void and will be deemed to be of no legal effect whatsoever."  FBR's offer to the Preferred Shareholders thus misrepresented the permissibility of the proposed repurchase of FBR TruPS and further amounted to a breach of Wells Fargo's contractual and fiduciary duties to the CDOs

6

in facilitating a transaction that was represented to be legitimate but which was, in actuality, prohibited, null and void.

12.     *Fourth*, it was also a breach of the Trust Declarations for the FBR Capital Trusts to use $5.25 million of trust assets for the purpose of repurchasing their own TruPS.  Rather, the Trust Declarations governing the FBR Capital Trusts strictly limited the purposes for which cash held by the Trusts could be used, with no provision permitting cash to be used for repurchasing TruPS (unless through express redemption procedures at 100% of par).  Moreover, the Trust Declarations expressly provided that "[i]n the event there is any money or other property held by or for the Trust that is not accounted for hereunder, such property shall be distributed pro rata … among the Holders of the Securities [*i.e.*, including the TruPS]."  Thus, to the extent that the FBR Capital Trusts had $5.25 million to make the offer that FBR "relayed" to the Preferred Shareholders, the FBR Capital Trusts were already under a contractual duty to distribute those funds to repay a corresponding portion of the debt obligations to the holders of the TruPS — and not to extinguish their total debt obligations through repurchasing their TruPS at a discount.  This was further misrepresented by FBR in the offers and an additional breach of Wells Fargo's contractual and fiduciary duties to the CDOs, again exacerbated by Wells Fargo's concealed conflict.

13.     Moreover, in addition to assisting FBR in facilitating its illegal scheme, Wells Fargo thereafter continued to abdicate its duties through concealing its misconduct from the CDOs' investors and failing to take appropriate steps to recoup FBR's ill gotten gains even after Wells Fargo was forced to concede its doubt that the scheme was ever permissible.

14.     Indeed, less than one month after selling the TruPS to the FBR Capital Trusts, and upon receiving a substantively identical proposal from another third-party to repurchase $450

million of performing TruPS for a price equal to 5% of the face amount from six CDOs,
including the three at issue in this case, Wells Fargo did an about-face.  While there was nothing
different in substance between the new offer and the previous offer from FBR, in the interim,
Noteholders had been alerted to Wells Fargo's misconduct, making it impossible for Wells Fargo
to conceal its handling of the new offer.  Rather than openly take the same position it had taken
in secret with respect to the FBR offer, Wells Fargo instead filed an interpleader complaint in
federal court conceding to the Court that Wells Fargo "is unable to determine, without exposing
itself to risk of liability, how to proceed in respect of the offers."

15.     Unsurprisingly, the virtually unanimous response to Wells Fargo's filing of the
interpleader confirmed that Wells Fargo's conduct in respect of the FBR offer had been
improper.  In total, fifteen parties that answered the interpleader complaint took the position that
the purported offer was prohibited under the terms of the CDOs' governing Indentures.  The
parties taking that position included many sophisticated institutions with extensive experience in
the CDO market, including four other CDOs, and numerous CDO arrangers and investors,
including Citibank N.A., Citigroup Global Markets Inc., Banc of America Securities LLC, ING
Capital LLC, Zions First National Bank, AG Financial Products and The Huntington National
Bank.  In the face of this overwhelming demonstration that paying bribes to Preferred
Shareholders is simply not allowed, the party that had issued the offer chose to rescind it and the
case was thereafter dismissed as moot.

16.     Yet, notwithstanding the clear demonstration that Wells Fargo's decision to
facilitate the FBR offers had been improper, it has failed to take any action to remedy the sales to
FBR and instead has continued to conceal the scope of its misconduct from investors.  For
example, in December 2010, upon receiving a request from Hildene for copies of the Trust

Declarations, Wells Fargo lied and said "the Trustee doesn't have the requested transactional documents." In fact, as trustee to the FBR Capital Trusts, Wells Fargo was a signatory to the Trust Declarations. Had Wells Fargo not concealed those documents, it would have revealed that the offer by the FBR Capital Trusts had been illegal under the terms of those agreements and that Wells Fargo had improperly conveyed $5.25 million in trust assets for the purpose of purchasing TruPS at a discount when it was already obligated to distribute those funds to the TruPS holders without them relinquishing the TruPS. Wells Fargo has thus acted unreasonably and to protect its own interests and those of FBR in direct conflict to its duties to the CDOs.

17.    For these reasons and others set forth herein, Hildene therefore brings this action individually and derivatively through Wells Fargo, as trustee, on behalf of the CDOs, to seek redress for FBR and Wells Fargo's breaches of contract, breaches of fiduciary duty and tortious conduct. Hildene also seeks disgorgement of profits unjustly obtained by FBR and the Preferred Shareholders, as well as treble damages against FBR and Wells Fargo for violating and conspiring to violate the Racketeer Influenced And Corrupt Organizations Act.

## THE PARTIES

18.    Plaintiff Hildene Capital Management, LLC is a private limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 500 Fifth Avenue, New York, New York. Hildene Capital Managent, LLC at all relevant times has been the manager of plaintiff Hildene Opportunities Master Fund, Ltd., which is organized under the laws of the Cayman Islands and which owns and holds the securities issued by Tropic III, Tropic IV and Soloso 2005-1 that are described herein.

19.    Defendant and nominal defendant Wells Fargo is a national banking association with its main office in Sioux Falls, South Dakota and its CDO Trustee office in Columbia

9

Maryland.  Wells Fargo is the trustee for the CDOs under the Indentures.  Wells Fargo is also the trustee for the FBR Capital Trusts under the Trust Declarations.

20.     On information and belief, Defendant Friedman, Billings, Ramsey Group, Inc. (d/b/a Arlington Asset Investment Corp.) ("FBR Inc.") is a company organized under the laws of Virginia with its principal place of business in Arlington, Virginia.

21.     On information and belief, FBR Capital Trust VI ("FBR Trust VI") is a statutory trust established by, among others, FBR and Wells Fargo, with its principal office in Arlington, Virginia.

22.     On information and belief, FBR Capital Trust X ("FBR Trust X"), is a statutory trust established by, among others, FBR and Wells Fargo, with its principal office in Arlington, Virginia.

23.     Defendants John and Jane Does 1 Through 100 are the Preferred Shareholders of Tropic IV and Soloso 2005-1 who voted to permit the sale of the selected Portfolio Collateral to FBR.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 1964, 1965.

25.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000 exclusive of interest or costs, and plaintiff is a citizen of a different State from each of the defendants.

26.     This Court also has original jurisdiction over this action pursuant to 12 U.S.C. § 632, because defendant Wells Fargo is a corporation organized under the laws of the United

States and this suit arises out of a transaction involving international banking because it involves the improper sale of securities by the CDOs, which are foreign special purpose vehicles incorporated in the Cayman Islands.

27.     This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367.

28.     Venue is proper in this district under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because FBR Inc. is found, has an agent or transacts business in New York and because a substantial part of the events giving rise to the claims occurred in New York.

<u>NATURE OF THE ACTION</u>

I.     <u>The Tropic III, Tropic IV and Soloso 2005-1 CDOs</u>

29.     A CDO is a special purpose vehicle that raises money by issuing and selling securities to investors, then uses that money to purchase a portfolio of assets (often referred to as the CDO collateral), usually consisting of bonds, loans or other debt obligations.  The cash flows from the underlying assets are used primarily to make interest and principal payments to the investors who bought the CDO's securities.

30.     Like most CDOs, Tropic III, Tropic IV and Soloso 2005-1 issued multiple classes of secured notes, as well a class of preferred shares, which represent equity interests in the CDO. These classes were not issued with the same level of risk.  Rather, as between the Noteholders and the Preferred Shareholders, the Noteholders have a higher priority of payment and are backed by a first-priority security interest in the Portfolio Collateral.  In contrast, the Preferred Shareholders are the junior-most stakeholders in each CDO.  They are not secured by the Portfolio Collateral and, as equity, they are entitled to payment only after sufficient income is generated by the Portfolio Collateral to make interest and principal payments to the Noteholders.

If the CDOs' collateral deteriorates to a given level (present at the time of the FBR offers and sales), the Preferred Shareholders receive no distributions until either the Noteholders have been paid in full or until the collateral performance improves.  Thus, if the Portfolio Collateral does not perform well, those lowest in the priority of payments hierarchy (known as the "waterfall") are the first to bear losses.  As in most CDOs, the investors in this "first loss" position for Tropic III, Tropic IV and Soloso 2005-1 — *i.e.*, the investors in the most subordinated position — are the Preferred Shareholders.

31.     The operation of Tropic III, Tropic IV and Soloso 2005-1 CDOs, including the rights and obligations of Wells Fargo, as trustee, and the conditions under which Portfolio Collateral may be sold, are governed, respectively, by indentures dated February 24, 2004, November 18, 2004 and August 24, 2005 among Wells Fargo, as trustee, and the respective CDOs (the "Indentures").  Copies of the Indentures are attached as Exhibits A, B, and C.  The provisions of the Indentures relevant to this dispute are materially identical in all respects.  As a Noteholder, Hildene is a third party beneficiary under the Indentures.

32.     As described in more detail below, Wells Fargo, as trustee, holds the Portfolio Collateral for the secured parties, including the Noteholders, and collects proceeds payable on the Portfolio Collateral which are then distributed to the Noteholders, and, if available, the Preferred Shareholders, pursuant to the waterfall priority of payments provisions in the Indentures.

33.     Prior to the events described below, the CDOs' Portfolio Collateral included certain TruPS issued by the FBR Capital Trusts.  Specifically, Tropic III and Tropic IV each owned $10 million of TruPS issued by FBR Trust VI pursuant to an Amended and Restated Declaration of Trust dated July 7, 2004 (the "FBR Trust VI Declaration").  Soloso 2005-1 owned

$15 million of TruPS issued by FBR Trust pursuant to an Amended and Restated Declaration of Trust dated April 29, 2005 (the "FBR Trust X Declaration" and together with the FBR Trust VI Declaration, the "Trust Declarations").  Wells Fargo served as trustee to the FBR Capital Trusts and was thus a party to the Trust Declarations pursuant to which the FBR TruPS were issued.  As owners of TruPS issued pursuant to the Trust Declarations, the CDOs are third party intended beneficiaries under those agreements.  Copies of the Trust Declarations are attached as Exhibits D and E.

34.     Hildene owns approximately $7.5 million face amount of the Class A3L Notes issued by the Soloso 2005-1 CDO,  $1 million face amount of the Class A4A Notes issued by the Tropic III CDO, and $1 million face amount of the Class A4L Notes issued by the Tropic IV CDO.

## II.     The CDOS Are Static Vehicles Not Intended To Purchase And Sell Collateral

35.     The CDOs were structured as static investment vehicles with no active management, meaning that the pool of assets held by the CDOs were intended to stay constant over the life of the transaction.  As explained by a leading CDO text: "The advantage to a static CDO is that the investor can examine the proposed portfolio before closing and know that the portfolio will not change."  Lucas et al, *Collateral Debt Obligations: Structures and Analysis* (2006, 2d. ed), p. 256.

36.     Because the CDOs were static investment vehicles, the Indentures provide for the sale of Portfolio Collateral only in very limited circumstances, for example, after an Event of Default if the Noteholders have directed the Trustee to sell (*see, e.g.*, Indentures §§ 5.4(a), 5.5(a)), or a sale in connection with an Optional Redemption in which all of the Noteholders are

paid interest and Principal in full (*see, e.g., id.* §§ 9.1(a), 1.1 at 19 (definition of "Optional Redemption Price")).

**III.**   **Portfolio Collateral Is Sold To FBR For Pennies On The Dollar**

37.   As described below, notwithstanding that the CDOs were intended to be static and there were strict limitations on the sale of Portfolio Collateral, Wells Fargo permitted the sale of key performing assets of the CDOs to FBR at fire-sale prices through FBR's payment of bribes to the CDOs' Preferred Shareholders.

**A.**   **FBR Offers To Purchase Portfolio Collateral Through Bribes To Preferred Shareholders**

38.   On June 9, 2009 , FBR sent letters to Tropic III and Tropic IV, and on June 10, 2009 to Soloso 2005-1, each "as holder of certain trust preferred securities," with copies to Wells Fargo, as the CDOs' trustee, purporting to "relay" offers from the FBR Trusts to "repurchase" the FBR TruPS held by the CDOs.  In the June 9, 2010 letters, FBR Inc. communicated FBR Trust VI's offer to repurchase the $20 million of TruPS it had issued that were held by Tropic III and Tropic IV ($10 million each) for a price of a mere $3 million ($1.5 million to each of Tropic III and Tropic IV).  In the June 10, 2010 letter,  FBR Inc. communicated FBR Trust X's offer to repurchase the $15 million of TruPS it had issued that were held by Soloso 2005-1 for a price of a mere $2.25 million.  FBR Inc. further offered the Tropic III, Tropic IV and Soloso 2005-1 Preferred Shareholders cash payments of $500,000, $500,000 and $750,000 respectively for their own benefit to induce them to consent to FBR's offers (the "Side Payments").  The TruPS that were the subject of FBR's offer were performing at the time, meaning that they were making all of their scheduled principal and interest payments to the CDOs, which in turn were being distributed to the CDOs' stakeholders, including primarily the Noteholders.

14

39.     FBR's offers to the Preferred Shareholders were purportedly predicated on the basis of a supermajority of the Preferred Shareholders possessing the right pursuant to Section 10.3(d) of the Indentures to direct the CDOs to sell the trust preferred securities at issue to FBR. As FBR and Wells Fargo both knew or should have known, however, as discussed below, Section 10.3(d) of the Indentures conferred no such rights on the Preferred Shareholders. This was never disclosed by FBR or Wells Fargo.

40.     Moreover, the offers to purchase the TruPS at issue was also predicated on the permissibility of the FBR Capital Trusts consummating such a purchase. However, as also discussed below, both FBR and Wells Fargo knew that the Trust Declarations pursuant to which such TruPS were issued precluded the FBR Capital Trusts from repurchasing their own securities and thus prohibited the very transactions that FBR was proposing. This also was never disclosed by FBR or Wells Fargo.

41.     FBR, as the ultimate guarantor of the selected collateral held by the CDOs that were the subject of its offers, thus made the offers as part of an unlawful effort to reduce its ongoing debt obligations and record a substantial gain at the expense of the CDOs and their Noteholders. According to FBR's own 2009 Annual Report, the offers were made as part of FBR's ongoing business strategy, announced in October 2008 and continuing through at least the end of 2009, to extinguish its long-term debt in the form of TruPS of over $300 million at a reported gain of $200 million. *See* FBR, Inc. 10-K Report (year end 12/31/2009) at p. 38.

**B.      Wells Fargo Forwards The Offer to the Preferred Shareholders In Breach of Its Contractual and Fiduciary Obligations**

42.     The very same day Wells Fargo received FBR's letters, it forwarded FBR's requests to the Preferred Shareholders of the CDOs, notifying the Preferred Shareholders of their purported "right to direct the Trustee whether to accept such Offer." Wells Fargo did so

notwithstanding that the Indentures and Trust Declarations prohibited any sale of the FBR TruPS in response to FBR's offers, and notwithstanding that the Indentures did not authorize the Preferred Shareholders to direct the Wells Fargo, as trustee, to proceed with the sale. Wells Fargo also failed to disclose in relaying the offer to the Preferred Shareholders that Wells Fargo was acting in a conflict capacity since it was not only serving as trustee to the CDOs but also to the FBR Capital Trusts that were seeking to repurchase their TruPS at a significant discount. Furthermore, even though FBR's offers clearly threatened to dissipate key performing assets that were securing the interests of the CDOs' Noteholders, Wells Fargo did not notify the CDOs' Noteholders of FBR's offers, or of the fact that it had forwarded this offer to the Preferred Shareholders and intended to proceed with the sales if so directed by a supermajority of the Preferred Shareholders. Wells Fargo also failed to notify the Noteholders of Wells Fargo's conflict sitting on both sides of a transaction that would substantially impact the CDOs' Noteholders.

43.     Wells Fargo's letters to the Preferred Shareholders included a "Direction to Accept Offer" which requested the Preferred Shareholders to set forth their identifying information and bank details and "consent[] to the release of any of its identifying and contact information (including payment information) to [the relevant] FBR Capital Trust ... and Arlington Asset ... for the purpose of communicating with and making any payments to the undersigned." In this way, Wells Fargo offered and agreed to pass on the consenting Preferred Shareholders' information to FBR so that FBR could make good on its offered Side Payments as promised.

44.     After concealing the existence of the FBR offers from Noteholders for three months, on September 9 and September 10, 2009, Wells Fargo sent a notice to all stakeholders in

the CDOs, including the Noteholders, advising them that it had "received the necessary direction from Holders representing at least 66-2/3% of the Preferred Share to accept the Offer." Even this belated notice was only made by Wells Fargo after Hildene became aware of FBR's offer from a third party Preferred Shareholder and confronted Wells Fargo about the impropriety of that offer and Wells Fargo's failure to adequately protect the Noteholders' interests. Wells Fargo's notice also continued to conceal that Wells Fargo was also serving as trustee to the acquiring FBR Capital Trusts and thus had a conflict in consummating the transaction. Wells Fargo's notice stated that it had "accepted the Offer pursuant to Section 10.3(d) of the Indenture and has released the securities that are the subject of the Offer [to the FBR Capital Trusts] against payment therefore." These securities were sold for a fraction of their outstanding principal balance.

45.     Wells Fargo then passed on to FBR the details of the Preferred Shareholders who had purportedly directed it to accept FBR's offer, and FBR paid those Preferred Shareholders the $1.75 million in promised Side Payments. Wells Fargo did not collect these Side Payments as "consent fees" on behalf of the CDOs, nor did it distribute these payments in accordance with the priority of payments set forth in the Indentures' waterfall. Rather, the Preferred Shareholders retained these payments themselves. If such Side Payments were in fact "consent fees" as described by FBR and the Trustee, they would be payable to the legal holder of the securities seeking the consent, namely the CDOs. The holders of the Preferred Shares are not entitled to "consent fees" associated with individual portfolio securities.

46.     This was not the first time that FBR had sought to improperly bribe Preferred Shareholders in an effort to gain a windfall for itself at the expense of CDO investors. Rather, FBR has attempted an identical scheme with at least two other CDOs, Tropic COD I Ltd and

Tropic CDO V Ltd., seeking in to repurchase TruPS issued by the FBR Capital Trusts worth $10 million and $5 million for a mere $1.5 million and $750,000, respectively. Again, FBR offered the Preferred Shareholders hundreds of thousands of dollars in bribes in return from their purported consents to the sales.

## IV.    The CDO Governing Indentures Did Not Permit the Sales to FBR

47.    The Indentures for the Tropic III, Tropic IV, and Soloso 2005-1 CDOs are the same in all respects material to this Complaint and confirm that the sales of the Portfolio Collateral to FBR were not permitted or authorized.

### A.    The Indentures Provide that the Portfolio Collateral Is to Be Held By The Trustee For the Benefit of The Noteholders.

48.    The Granting Clause of the Indenture provides that the Trust Estate — a term defined to include all Portfolio Collateral — is pledged to Wells Fargo, as trustee, for the benefit of the Noteholders, and not the Preferred Shareholders:

> The Issuer hereby Grants to the Trustee, *for the benefit and security of the Holders of the Notes* and for the benefit of the Trustee, the Paying and Transfer Agent, the Collateral Administrator, the Securities Intermediary and the Hedge Counterparties *a first priority security interest* in all of its right, title and interest, whether now existing or hereafter acquired or arising, in, to and under the following ... provided that such security interest shall not extend to any property, cash or other amounts specifically released from the lien of this Indenture or otherwise to be paid to the Issuer in accordance with the terms hereof.

Indentures, at pp. 1-2 (Granting Clause, emphasis added). The Collateral is thus pledged to the Trustee who holds the Portfolio Collateral (along with the rest of the Trust Estate) to secure the Notes for the benefit of the Noteholders.

49.    The Noteholders also are empowered to direct Wells Fargo, as trustee, in the exercise of its obligations under the Indenture. Section 5.14 of the Indenture is entitled Control by Noteholders and provides that, "[n]otwithstanding any other provision of this Indenture, the

Requisite Noteholders … shall have the right … to direct the Trustee with respect to its exercise of any right, remedy, trust or power" subject to the Trustee indemnification under 6(e).

50.     These provisions show that Wells Fargo was responsible for holding the Portfolio Collateral underlying the CDOs — including the TruPS that it sold to FBR — for the benefit of the Noteholders and **_not_** the Preferred Shareholders that received the bribes from FBR to purportedly consent to the sales.  It was therefore a breach of these provisions for Wells Fargo to allow those TruPS to be absconded by FBR in a manner that provided a windfall to the Preferred Shareholders through the payment of bribes while dissipating the assets securing the Noteholders' investments.

### B.     The Indentures Provide That The Trustee Acts As A Fiduciary To The Noteholders In Respect Of Portfolio Collateral.

51.     Section 6.17 of the Indenture, entitled "Fiduciary for Noteholders," provides that "the Delivery of any item of Collateral to the Trustee is to the Trustee _as Trustee for the Noteholders_ and agent for the Paying and Transfer Agent, the Collateral Administrator, the Securities Intermediary and the Hedge Counterparties" and that "the possession by the Trustee of any item of Collateral and the endorsement to or registration in the name of the Trustee of any item of Collateral (including without limitation as entitlement holder of the Collateral Account) are all undertaken by the Trustee in its capacity _as Trustee for the Noteholders_ and agent for the Paying and Transfer Agent and (solely for the purposes of the Granting Clauses hereof) the Hedge Counterparties." (emphasis added).  _See also_ Section 12.3(b) Underlying Instruments (Requisite Noteholders right to direct Trustee as to any item of collateral in default).

52.     This provision makes clear that Wells Fargo owes express fiduciary duties to the Noteholders, specifically with respect to the delivery and possession of the Portfolio Collateral. Indeed, it states twice that the Trustee serves "as Trustee for the Noteholders" (while merely as

agent for others) and, in the last sentence, also conspicuously excludes the Noteholders from the list of persons to whom the Trustee does not owe fiduciary duties. It was a breach of those duties for Wells Fargo to sell Portfolio Collateral to FBR for pennies on the dollar on the basis of bribes FBR had paid to the Preferred Shareholders, especially while keeping the transactions concealed from the Noteholders to whom Wells Fargo owed its fiduciary duties. It was furthermore a breach of these duties for Wells Fargo to conceal its conflicted role as trustee to the FBR Capital Trusts that were receiving the windfall through purchasing the FBR TruPS for such steep and impermissible discounts.

### C.   The Indenture Prohibits the Sale of Portfolio Collateral Other Than As Expressly Provided.

53.     As set forth above, the CDOs are "static" vehicles, meaning that it was contemplated by the parties that the CDOs' Portfolio Collateral would remain intact through the life of the deal, absent an Event of Default, payment in full to the Noteholders, amortization or other circumstances expressly set forth in the Indenture. For this reason, section 7.8 of the Indentures, entitled "Negative Covenants," bars the CDO Issuer or the Trustee from selling Portfolio Collateral, except as expressly permitted by the Indentures.

54.     Section 7.8(a) of the Indenture provides:

> The Issuer will not: (1) *sell, transfer, exchange or otherwise dispose of,* or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), *any part of the Trust Estate, except as expressly permitted by this Indenture*.

(emphasis added).

55.     Similarly, section 7.8(c) of the Indenture specifically provides:

> *The Trustee shall not sell, transfer, exchange or otherwise dispose of,* or enter into or engage in any business with respect to, *any part of the Trust Estate, except as expressly permitted by this Indenture.*

(emphasis added).

56.     Nothing in the Indenture "expressly permitted" the sale of Portfolio Collateral for pennies on the dollar upon the request, direction or consent of the Preferred Shareholders (or anyone else).  It was therefore also a breach of these provisions for Wells Fargo to sell the TruPS to FBR without any express provision of the Indentures permitting it to do so.

**D.      Section 10.3(d) of the Indentures Provide Only For The Release of the Lien Where The Indenture Elsewhere Permits a Sale**

57.     Pursuant to the Indenture, the limited power to sell Portfolio Collateral is vested with the CDO Issuer and the Trustee only, consistent with their negative covenants in Article 7.

58.     The Granting Clause of the Indentures explain that Collateral may only be removed from the Trust if it is "specifically released from the lien of this Indenture or otherwise to the paid to the Issuer in accordance with the terms hereof."

59.     Section 10.3(d) of the Indenture provides the mechanism for releasing such liens:

> The Trustee on behalf of the Issuer shall notify the Holders of the Preferred Shares of any Portfolio Collateral that is subject to an Offer. If no Event of Default has occurred and is continuing and subject to the provisions of Article XII hereof, the Holders representing at least 66-2/3% of the Preferred Shares *may direct the Trustee to release from the lien* of this Indenture such Portfolio Collateral in accordance with the terms of the Offer in each case against receipt of payment therefor.

(emphasis added).

60.     Section 10.3(d) of the Indenture does not contain any provision for the sale of Portfolio Collateral.  It does not permit the Preferred Shareholders to direct the sale of Portfolio Collateral.  It merely permits 66-2/3% of the Preferred Shareholders to direct the Trustee to "release ... the lien of the Indenture" on assets that the Trustee, on behalf of the CDO, seeks to sell in accordance with the express provisions of the Indenture.

61.     The underlying rationale of Section 10.3(d) is that Preferred Shareholders are the first to take losses under the Indenture and therefore should have a method for raising objections

to insufficient offers.  Thus, Section 10.3(d) provides a super majority of the Preferred

Shareholders with the right to prevent a sale of Portfolio Collateral by simply declining to release

the Collateral from the lien of the Indenture.  However, Section 10.3(d) does not permit the

Preferred Shareholders to unilaterally direct the sale of Collateral in response to an offer.

62.     The language in Section 10.3(d) can be directly contrasted with Section 12.2 (not

applicable on these facts), which permits the Preferred Shareholders to "direct the Trustee to

sell" an item of Portfolio Collateral that is the subject of a bona fide Offer if the Preferred

Shareholders "certify to the Trustee that the sales price for such Security is equal to or greater

than the price available pursuant to the Offer."  It is clear, that when the Indentures' drafters

intended to empower the Preferred Shareholders to "direct a sale," they knew how do so.

Section 10.3(d) does not contain this language or confer such power.

63.     Section 10.3(d) of the Indentures thus provided no basis upon which Wells Fargo

was permitted to sell Portfolio Collateral to FBR nor did it permit FBR to pay bribes to Preferred

Shareholders in exchange for their purported direction to Wells Fargo to sell the FBR TruPS.

**E.     The Side Payments Belong to the Trust Estate And Must Be Distributed
Through The Waterfall.**

64.     Moreover, pursuant to the terms of the Indentures, any proceeds generated with

respect to the Portfolio Collateral is required to be collected by Wells Fargo and distributed in

accordance with the Indentures' payment priority provisions.  Thus, even if the payments made

by FBR to the Preferred Shareholders to induce those Shareholders to consent to FBR's

purported offers were proper (which they were not), they belonged to the Trust Estate and should

have been collected by Wells Fargo and distributed accordingly.

65.     Pursuant to the Indenture, the Trustee is obligated to collect and distribute in

accordance with the strict priority of payment provisions in Section 11.1, "all payments of any

principal with respect to any Portfolio Collateral," "all payments of interest with respect to any Portfolio Collateral," as well as "*any payments ... received pursuant to a consent or similar solicitation.*" *See* Indentures § 1.1 (definitions of "Collateral Principal Collections" and "Collateral Interest Collections").

66.     Section 11.1(b) of the Indentures contain "waterfall" provisions which direct the Trustee to distribute all such collections in accordance with the priority of payments set forth therein. All Noteholders are senior in priority to the Preferred Shareholders, meaning they are entitled to receive distributions of cash proceeds collected by the Trustee first, before the Preferred Shareholders receive any payments.

67.     Thus, even if the payments made by FBR to the Preferred Shareholders were proper, because those payments were made "with respect to any Portfolio Collateral" and were also payments received "pursuant to a consent or similar solicitation" these payments belong to the Trust Estate and should have been collected by the Wells Fargo, as trustee, for distribution according to the Indentures' priority of payment waterfalls. The failure of Wells Fargo to collect those payments for distribution through the CDOs' waterfalls was thus another breach of the CDOs' Indentures.

**V.     The Sales To FBR Were Also Prohibited Under The FBR TruPS Trust Declarations**

68.     In addition to the sales of the TruPS from the CDOs to FBR having been a breach of the CDOs' Indentures, those sales were also in violation of express contractual provisions underlying each of the FBR TruPS that were sold. As owner of the FBR TruPS, the CDOs were intended beneficiaries of those contractual obligations, entitled to enforce their terms.

A.   **The Trust Declarations Prohibit The FBR Trusts From Purchasing Their Own Securities At A Discount**

69.   Each of the Trust Declarations governing the terms of the FBR TruPS sets forth certain restrictions and limitations on the transfer or purchase of those securities.  Each of those TruPS had been issued by the FBR Capital Trusts and FBR was thus in possession of the Trust Declarations for each security.  In addition, Wells Fargo was the Trustee for each of the FBR Capital Trusts and thus also was in possession of each of the Trust Declarations as well.

70.   Section 2.7 of the Trust Declarations prohibits the FBR Capital Trusts from "acquir[ing] any assets other than as expressly provided herein."  Section 2.6 of the Trust Declarations similarly provides that "the Trust (or the Trustees or Administrators acting on behalf of the Trusts) shall not undertake any business, activities or transaction except as expressly provided herein or contemplated hereby.  In particular, neither the Trustees nor the Administrators may cause the Trust to … acquire any investments or engage in any activities not authorized by this Declaration."

71.   There is no provision in the Trust Declarations providing for the FBR Capital Trusts to repurchase their own TruPS at a discount.  Rather, the only permissible way for the FBR Capital Trusts to reacquire their own securities is pursuant to specific redemption procedures set forth in Section 4 of Annex 1 to the Trust Declarations.  Most significantly, these procedures provide that any redemption of the TruPS must be effected at a "Redemption Price" which is 100% of the securities being redeemed.  In other words, the Trust Declarations prohibit the FBR Capital Trusts from reacquiring their own securities for less than 100% of their principal amount.

72.   Moreover, the Trust Declarations also provide, pursuant to section 8.1(c), that the TruPS "may only be transferred, in whole or in part, in accordance with the terms and conditions

set forth in the Declaration."  Any transfer not made in accordance with the Trust Declarations is "null and void and will be deemed to be of no legal effect whatsoever."

73.     Finally, the FBR Capital Trusts do not have discretion to use available funds to purchase securities, including their own TruPS.  Rather, pursuant to Section 4(g) of Annex 1, any excess funds held by the Trust "shall be distributed pro rata … among the Holders of the Securities."

**B.     The Sales To FBR Violated the Trust Agreements**

74.     As Wells Fargo and FBR thus well knew, the sales of the FBR TruPS to the FBR Capital Trusts at discounted prices violated the terms of the Trust Declarations to which the CDOs were intended beneficiaries.

75.     First, the Trust Declarations rendered it impermissible for the FBR Capital Trusts to repurchase their own TruPS on the terms proposed by FBR to the CDOs, since this acquisition was not a redemption consistent with the provisions of the Trust Declarations, and was for a price significantly less than the par value of the securities.  The sales were thus a breach of Section 2.6, Section 2.7 and Section 4 of Annex 1.

76.     Second, the use of $5.75 million of funds held by the FBR Capital Trusts to effectuate the offers to the CDOs constituted a misappropriation of the FBR Capital Trusts' assets.  Rather, to the extent the FBR Capital Trusts held the funds necessary to the make the offers, then the FBR Capital Trusts — and Wells Fargo as their trustee — was already under a contractually mandated obligation pursuant to Section 4(g) of Annex 1 to distribute those funds to the holders of the FBR TruPS — without any request or demand that they relinquish their TruPS.

77.     Finally, since the purchase of the securities by the FBR Capital Trusts was made other than in accordance with the terms of the Trust Declarations, the purported transfer of those TruPS from the CDOs to the FBR Capital Trusts was "null and void."

78.     FBR and Wells Fargo, as parties to the Trust Declarations, were thus aware at the time the FBR Capital Trusts made their offers to repurchase the TruPS from the CDOs that the proposed sale was thus unlawful and without any legal effect.  However, both Wells Fargo and FBR concealed from the CDOs — the intended beneficiaries of the obligations under the Trust Declarations — that the FBR Capital Trusts' repurchase of the TruPS amounted to a breach of the Trust Declarations underlying each of those securities.  Wells Fargo further concealed from the CDOs its conflicted role as trustee pursuant to the breached Trust Declarations.

## VI.     Wells Fargo Admits Its Sales To FBR May Have Been Impermissible

79.     Notwithstanding Wells Fargo's active assistance in facilitating FBR's scheme to improperly extinguish its obligations on the FBR TruPS, it has since been forced to concede that the sales to FBR may not have been permitted by the Indentures.  Less than one month after selling the selected FBR TruPS to the FBR Capital Trusts in breach its contractual and fiduciary duties, and upon receiving a substantively identical proposal from another third-party, Trust Preferred Solutions LLC ("TPS"), to repurchase $450 million of other TruPS at a price of 5% of the face amount from six CDOs, including Tropic III, Tropic IV and Soloso 2005-1, Wells Fargo filed an interpleader complaint in federal court, conceding that it was "unable to determine, without exposing itself to risk of liability, how to proceed in respect of the offer" from TPS.

80.     Unsurprisingly, the virtually unanimous response to Wells Fargo's filing of the interpleader confirmed that it was improper for Wells Fargo to allow TruPS to be sold out of the CDOs at discounted prices in connection with bribes being paid to Preferred Shareholders — as

FBR had just done. In total, fifteen parties that answered the interpleader complaint took the

position that the purported offer was prohibited under the terms of the CDOs' governing

Indentures. The parties taking that position included many sophisticated institutions with

extensive experience in the CDO market, including four other CDOs, and numerous CDO

arrangers and investors, including Citibank N.A., Citigroup Global Markets Inc., Banc of

America Securities LLC, ING Capital LLC, Zions First National Bank, AG Financial Products

and The Huntington National Bank. As a brief filed by Citibank N.A. and Citigroup Global

Markets Inc. on behalf of all of the fifteen objecting defendants argued with respect to the very

same Indentures at issue in this case:

> Nothing in the Indentures permits the Trustees or Issuers to sell Portfolio
> Collateral for pennies on the dollar at the behest of Preferred Shareholders — who
> hold the junior-most tranche of securities and are exposed to first losses on the
> portfolio — except in rare circumstances not applicable to the offers by TPS,
> which are at the core of the present dispute. TPS seeks to strip the CDOs — most
> immediately, the Tropic IV CDO — of valuable Portfolio Collateral by paying *de
> minimis* amounts to the CDO for the specific items of Portfolio Collateral and
> bribing Preferred Shareholders to consent to such a sale …. Any sale of Portfolio
> Collateral subject to TPS offers would, therefore, be contrary to the contractual
> and fiduciary duties which the Issuer and Trustee owe to the Noteholders. It is
> both prohibited and unauthorized.

A copy of Citibank's brief is attached hereto as Exhibit G. In the face of this overwhelming

demonstration that paying bribes to Preferred Shareholders is simply not allowed, TPS chose to

rescind its offer and the case was thereafter dismissed as moot.

     81.     However, notwithstanding that Wells Fargo clearly harbored significant doubts as

to the lawfulness of the sales of the CDOs' securities to the FBR Capital Trusts, as demonstrated

by its interpleader filing, and that it was unanimously told by the Noteholders who responded to

the interpleader in no uncertain terms that such sales were "prohibited and unauthorized," Wells

Fargo failed thereafter to take any steps to rectify the sales it had facilitated to the FBR Capital

Trusts.

## VII.   Wells Fargo Continues To Conceal Defendants' Wrongdoing

82.     In fact, far from acting to seek redress on behalf of the CDOs, Wells Fargo has instead repeatedly conspired to cover up its own wrongdoing, as well as the wrongdoing of FBR. For example, in December 2010, concerned that the sales to the FBR Capital Trusts had been in violation of the Trust Declarations, Hildene made a request to Wells Fargo's counsel for a copy of those documents.  In response to that request, Wells Fargo's counsel responded that he had been advised to tell Hildene that "the Trustee doesn't have the requested transaction documents." That statement was false.  Wells Fargo was a *signatory* to the Trust Declarations.

83.     In January 2011, Hildene followed up by sending a request for the same documents to a senior executive at Wells Fargo, explaining:

> We expect to find that FBR was not permitted under the documents to acquire the
> securities and we can then pursue FBR for wrongfully acquiring the lost
> securities.  I would like to set up a call with Wells Fargo to discuss this matter.
> We are going to pursue this strenuously with FBR.  I had hoped we could get this
> information with the assistance of Wells Fargo, but if that is not the case, we are
> prepared to treat it adversarial.

Wells Fargo never responded to that request, instead choosing to continue concealing the terms of the Trust Declarations.  Indeed, it was not until filing this litigation against FBR and Wells Fargo that Hildene was able to obtain copies of the Trust Declarations which revealed the blatant breaches of those agreements by Wells Fargo and FBR that Wells Fargo had been trying to cover up.

84.     Hildene therefore brings this action individually and derivatively through Wells Fargo, as trustee, on behalf of the CDOs to protect their rights and entitlements, and to obtain redress for the defendants' unlawful conduct.

## CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT: CDO INDENTURES
### (Individually Against Wells Fargo)

85.     Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

86.     Hildene brings this individually on its own behalf.

87.     Wells Fargo, as trustee, is a party to the Tropic III, Tropic IV and Soloso 2005-1 Indentures.

88.     Hildene, as a noteholder,, is a third party beneficiary of the Indentures.

89.     The express provisions of the Indentures provides as follows:

    a)     Sections 7.8(a)(1) and (c) of the Indentures prohibit the sale of Portfolio Collateral except as expressly permitted by the Indentures.  No provision of the Indentures permitted the sale of the TruPS to FBR.  In particular, section 10.3(d) of the Indentures did not authorize the Trustee or the Issuer to sell the TruPS to FBR.  Nor did this section authorize the Preferred Shareholders to direct the Trustee or the Issuer to sell the TruPS;

    b)     Any payments made with respect to the CDOs' Portfolio Collatateral constitute either Collateral Principal Collection and/or a Collateral Interest Collections, as those terms are defined in the Indentures; and

    c)     Pursuant to the Indentures, Collateral Principal Collection payments or Collateral Interest Collection Payments are the property of the Trust Estate, to be held by the Trustee for distribution to the CDOs' Noteholders in accordance with the priority of payments waterfall set forth in the Indentures.

90.     Wells Fargo breached the express provisions of the Indentures by:

    a)     causing the TruPS held by Tropic IV and Soloso 2005-1 to be sold to FBR;

    b)     permitting the Preferred Shareholders to collect the Side Payments from FBR in relation to the TruPS, which properly belonging to the Trust Estate; and

    c)     failing to collect these Side Payments and by failing to distribute these amounts pursuant to the priority of payments set forth in the Indenture.

91.     As with all contracts governed by New York law, the Indentures include an implied covenant that the parties will act in good faith and engage in fair dealing with respect to their obligations under the Indentures.  Among other things this covenant obliged the Trustee to:

a)      refrain from conduct that would distort the intended operation of the CDOs and deprive the Noteholders of their bargained-for-security in the Portfolio Collateral; and

b)      refrain from permitting a third party to deplete the underlying assets held by the CDO for pennies on the dollar and to induce the Preferred Shareholders with cash bribes to act in a manner contrary to the interests of the CDO and its creditors thereby frustrating the purpose and structure established under the Indentures.

92.     Wells Fargo breached the implied covenant of good faith and fair dealing by permitting FBR and the Preferred Shareholders to frustrate the economic bargain, structure and logic of the CDOs by selling the TruPS to FBR for fire sale prices at the behest of the Preferred Shareholders and permitting FBR to pay the Preferred Shareholders cash bribes in return for their purported consent to the sales.  Wells Fargo further breached the implied covenant of good faith and fair dealing by:

a)      failing to collect and distribute the Side Payments in accordance with the Indentures' waterfall provisions thereby denying the Noteholders their bargained for security interest in the Portfolio Collateral and Trust Estate;

b)      failing to take into proper account whether the FBR offer was in the best interest of the CDO and permitted by contractual documents before notifying the Preferred Shareholders of the purported offer and proceeding with sales;

c)      failing to notify the Noteholders of FBR's offer and the proposed sales;

d)      failing to exercise its right and duties as trustee and file an interpleader seeking direction as to the proper interpretation of the key provisions; and

e)      forwarding FBR's offer to the Preferred Shareholders and selling the TruPS to FBR notwithstanding that Wells Fargo was not certain of its contractual duties and obligations, as demonstrated by the Wells Fargo's subsequent interpleader filing in identical circumstances.

93.     Wells Fargo's breaches in each of the above respects was and is unreasonable, wanton, willful and reckless and made in bad faith.

30

94.     Hildene has fulfilled each and every one of its material contractual obligations, if any, under the Indentures.

95.     Hildene has suffered financial harm as a result of Wells Fargo's breaches and is entitled to damages in an amount to be determined at trial.

<u>COUNT II: BREACH OF CONTRACT: CDO INDENTURES</u>
**(Derivatively Through Wells Fargo on Behalf of the CDOs Against Wells Fargo)**

96.     Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

97.     This cause of action is brought derivatively through Wells Fargo, as trustee, on behalf of the CDOs.

98.     Wells Fargo, as trustee, and the CDOs, are party to the Tropic III, Tropic IV and Soloso 2005-1 Indentures.

99.     Hildene is a third party beneficiary of the Indentures.

100.    The express provisions of the Indentures provides as follows:

a)      Sections 7.8(a)(1) and (c) of the Indentures prohibit the sale of Portfolio Collateral except as expressly permitted by the Indentures. No provision of the Indentures permitted the sale of the TruPS to FBR. In particular, section 10.3(d) of the Indentures did not authorize the Trustee or the Issuer to sell the TruPS to FBR. Nor did this section authorize the Preferred Shareholders to direct the Trustee or the Issuer to sell the TruPS;

b)      Any payments made with respect to the CDOs' Portfolio Collatateral constitute either Collateral Principal Collection and/or a Collateral Interest Collections, as those terms are defined in the Indentures; and

c)      Pursuant to the Indentures, Collateral Principal Collection payments or Collateral Interest Collection Payments are the property of the Trust Estate, to be held by the Trustee for distribution to the CDOs' Noteholders in accordance with the priority of payments waterfall set forth in the Indentures.

101.    Wells Fargo breached the express provisions of the Indentures by:

a)      causing the TruPS held by Tropic IV and Soloso 2005-1 to be sold to FBR;

31

b)      permitting the Preferred Shareholders to collect the Side Payments from FBR in relation to the TruPS, which properly belonging to the Trust Estate; and

c)      failing to collect these Side Payments and by failing to distribute these amounts pursuant to the priority of payments set forth in the Indenture.

102.    As with all contracts governed by New York law, the Indentures include an implied covenant that the parties will act in good faith and engage in fair dealing with respect to their obligations under the Indentures.  Among other things this covenant obliged the Trustee to:

a)      refrain from conduct that would distort the intended operation of the CDOs and deprive the Noteholders of their bargained-for-security in the Portfolio Collateral; and

b)      refrain from permitting a third party to deplete the underlying assets held by the CDO for pennies on the dollar and to induce the Preferred Shareholders with cash bribes to act in a manner contrary to the interests of the CDO and its creditors thereby frustrating the purpose and structure established under the Indentures.

103.    Wells Fargo breached the implied covenant of good faith and fair dealing by permitting FBR and the Preferred Shareholders to frustrate the economic bargain, structure and logic of the CDOs by selling the TruPS to FBR for fire sale prices at the behest of the Preferred Shareholders and permitting FBR to pay the Preferred Shareholders cash bribes in return for their purported consent to the sales.  Wells Fargo further breached the implied covenant of good faith and fair dealing by:

a)      failing to collect and distribute the Side Payments in accordance with the Indentures' waterfall provisions thereby denying the Noteholders their bargained for security interest in the Portfolio Collateral and Trust Estate;

b)      failing to take into proper account whether the FBR offer was in the best interest of the CDO and permitted by contractual documents before notifying the Preferred Shareholders of the purported offer and proceeding with sales;

c)      failing to notify the Noteholders of FBR's offer and the proposed sales;

d)      failing to exercise its right and duties as trustee and file an interpleader seeking direction as to the proper interpretation of the key provisions; and

e)      forwarding FBR's offer to the Preferred Shareholders and selling the Portfolio Collateral to FBR notwithstanding that Wells Fargo was not

certain of its contractual duties and obligations, as demonstrated by the Wells Fargo's subsequent interpleader filing in identical circumstances.

104.    Wells Fargo's breaches in each of the above respects was and is unreasonable, wanton, willful and reckless and made in bad faith.

105.    The CDOs have fulfilled each and every one of their material contractual obligations, if any, under the Indentures.

106.    The CDOs have suffered financial harm as a result of Wells Fargo's breaches and are entitled to damages in an amount to be determined at trial.

## COUNT III: BREACH OF CONTRACT: TRUST DECLARATIONS
### (Derivatively Through Wells Fargo on Behalf of the CDOs Against Wells Fargo and FBR)

107.    Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

108.    This cause of action is brought derivatively through Wells Fargo, as trustee, on behalf of the CDOs.

109.    Wells Fargo, as trustee, FBR Inc. and FBR Capital Trust VI are parties to the Amended and Restated Declaration of Trust dated July 7, 2004 and Wells Fargo, as trustee, FBR Inc. and FBR Capital Trust X are parties to the Amended and Restated Declaration of Trust dated April 29, 2009 (together, "the Trust Declarations").

110.    As a holder of the FBR TruPS issued under the Trust Declarations, each of the CDOs are intended beneficiaries.

111.    The express provisions of the Trust Declarations provide as follows:

a)      Sections 2.6 and 2.7 of the Trust Declarations prohibit the FBR Capital Trust from acquiring any assets except as expressly provided by the Trust Declarations.  The FBR Capital Trusts may not repurchase their own TruPS at a discount and may only reacquire their own securities pursuant to a redemption under Section 4 of Annex 1 at a "Redemption Price" of 100%.

b)          Section 4(g) of Annex 1 of the Trust Declarations provides that any excess funds held by the Trust "shall be distributed pro rata … among the Holders of the Securities." Any available fund held by the FBR Capital Trusts belong to the holders of the TruPS and the FBR Captial Trusts do not have discretion to use available funds to purchase their own TruPS at a discount;

c)          Under section 8.1(c) of the Trust Declarations, any transfer not made in accordance with the Trust Declarations is "null and void and will be deemed to be of no legal effect whatsoever."

112.    The FBR Defendants and Wells Fargo breached the express provisions of the Trust Declarations by:

a)          causing the FBR Capital Trusts to repurchase their own TrUPS at a discount from the CDOs other than in accordance with the redemption provisions of the Trust Declarations;

b)          misappropriating the $5.75 million in funds held by the FBR Capital Trusts by using these funds to repurchase the FBR TruPS, instead of distributing these funds to the CDOs, as the TrUPS holders, pro rata;

c)          failing to treat the purported transfer of the TrUPS from the CDOs to the FBR Capital Trusts as "null and void." Wells Fargo's breaches in each of the above respects was and is unreasonable, wanton, willful and reckless and made in bad faith.

113.    The CDOs have fulfilled each and every one of their material contractual obligations, if any, under the Trust Declarations.

114.    The CDOs have suffered financial harm as a result of Wells Fargo and FBR's breaches and are entitled to damages in an amount to be determined at trial.

## COUNT IV: BREACH OF FIDUCIARY DUTY
### (Individually Against Wells Fargo)

115.    Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

116.    Hildene brings this Count individually on its own behalf.

117.    Wells Fargo, as trustee, owes implied and express fiduciary duties to Hildene, as Noteholders.  In particular, as trustee, Wells Fargo is under a duty to act for the benefit of the

Noteholders, including Hildene, and to act prudently and with a high degree of care in exercising its duties and obligations under the Indentures.  Hildene reposed a high level of trust and confidence in Wells Fargo, as trustee, and reasonably relied on Wells Fargo's superior expertise and knowledge, including in enforcing and applying its rights and obligations under the Indentures.

118.    Section 6.17 of the Indentures, titled "Fiduciary for Noteholders," expressly provide that Wells Fargo, as trustee, owes fiduciary duties to the Noteholders with respect to the Trustee's acceptance, possession and handling of the CDOs' Portfolio Collateral.

119.    Wells Fargo breached its fiduciary obligations by failing to act prudently in exercising its duties under the Indentures with respect to its possession of the CDOs' Portfolio Collateral and Trust Estate by, including by:

a)      selling the TruPS to FBR for pennies on the dollar;

b)      failing to collect and distribute the Side Payments in accordance with the Indentures' waterfall provisions;

c)      permitting FBR and the Preferred Shareholders to circumvent the capital structure of the CDOs and the waterfall priority of payments and frustrate the economic bargain and logic of the CDOs as set forth in the Indentures and Offering Memorandum at the expense of the Noteholders;

d)      failing to take into proper account whether the FBR offer was in the best interest of the CDO and permitted by contractual documents before notifying the Preferred Shareholders of the purported offer and proceeding with sales;

e)      failing to notify the Noteholders of FBR's offer and the proposed sales;

f)      failing to disclose Wells Fargo's simultaneous and conflicted role as trutee to the FBR Capital Trusts;

g)      failing to exercise its right and duties as Trustee and file an interpleader seeking direction as to the proper interpretation of the key provisions of the Indentures; and

h)      forwarding FBR's offer to the Preferred Shareholders and selling the TruPS to FBR notwithstanding that Wells Fargo was not certain of its contractual duties and obligations, as demonstrated by the Wells Fargo's subsequent interpleader filing in another near-identical matter.

120.    Wells Fargo's breaches in these respects was and is unreasonable, wanton, willful and reckless and made in the absence of good faith.

121.    As a foreseeable result of Wells Fargo's breach of its fiduciary duties, Hildene has suffered financial harm and is entitled to damages in an amount to be determined at trial.

## COUNT V: BREACH OF FIDUCIARY DUTY
**(Derivatively Through Wells Fargo on Behalf of the CDOs Against Wells Fargo)**

122.    Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

123.    Hildene brings this Count derivatively through Wells Fargo, as Trustee, on behalf of the CDOs.

124.    Wells Fargo, as trustee, fiduciary duties to the CDOs.  In particular, as trustee, Wells Fargo is under a duty to act for the CDOs, and to act prudently and with a high degree of care in exercising its duties and obligations under the Indentures.  The CDOs reposed a high level of trust and confidence in Wells Fargo, as trustee, and reasonably relied on Wells Fargo's superior expertise and knowledge, including in enforcing and applying their rights and obligations under the Indentures.

125.    Wells Fargo breached its fiduciary obligations by failing to act prudently in exercising its duties under the Indentures with respect to its possession of the CDOs' Portfolio Collateral and Trust Estate by, including by:

a)      selling the TruPS to FBR for pennies on the dollar;

b)      failing to collect and distribute the Side Payments in accordance with the Indentures' waterfall provisions;

c)      permitting FBR and the Preferred Shareholders to circumvent the capital structure of the CDOs and the waterfall priority of payments and frustrate the economic bargain and logic of the CDOs as set forth in the Indentures and Offering Memorandum;

d)      failing to take into proper account whether the FBR offer was in the best interest of the CDOs and permitted by contractual documents before notifying the Preferred Shareholders of the purported offer and proceeding with sales;

e)      failing to notify the Noteholders of FBR's offer and the proposed sales;

f)      failing to disclose Wells Fargo's simultaneous and conflicted role as trutee to the FBR Capital Trusts;

g)      failing to exercise its right and duties as Trustee and file an interpleader seeking direction as to the proper interpretation of the key provisions of the Indentures; and

h)      forwarding FBR's offer to the Preferred Shareholders and selling the TruPSI to FBR notwithstanding that Wells Fargo was not certain of its contractual duties and obligations, as demonstrated by the Wells Fargo's subsequent interpleader filing in another near-identical matter.

126.    Wells Fargo's breaches in these respects was and is unreasonable, wanton, willful and reckless and made in the absence of good faith.

127.    As a foreseeable result of Wells Fargo's breach of its fiduciary duties, the CDOs have suffered financial harm and are entitled to damages in an amount to be determined at trial.

## COUNT VI: TORTIOUS INTERFERENCE
### (Individually Against FBR)

128.    Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

129.    Hildene brings this Count individually on its own behalf.

130.    The Indentures are valid and binding contracts between the Wells Fargo and the CDOs.

131.    Hildene has a legal, equitable right, remedy or claim under the Indentures and is an intended beneficiary under the Indentures.

132.    FBR knew of the Indentures and their terms.

133.    FBR intentionally and improperly procured breaches of the Indentures by purchasing the TruPS from the CDOs. In addition, FBR intentionally and improperly procured

breaches of the Indentures by making Side Payments to the Preferred Shareholders instead of to the Trustee on behalf of the CDOs and its creditors for distribution in accordance with the priority of payments waterfall set forth in the Indentures.

134.    FBR acted wrongfully without justification or excuse.

135.    As a direct and proximate cause of FBR's tortious interference, Hildene has suffered damages in an amount to be determined at trial.

### COUNT VII: TORTIOUS INTERFERENCE
### (Derivatively Through Wells Fargo on Behalf of the CDOs Against FBR)

136.    Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

137.    Hildene brings this Count derivatively through Wells Fargo, as trustee, on behalf of the CDOs.

138.    The Indentures are valid and binding contracts between the Wells Fargo and the CDOs .

139.    The CDOs have a legal, equitable right, remedy or claim under the Trust Declarations and are intended beneficiaries under the Trust Declarations.

140.    FBR knew of the Indentures and Trust Declarations and their terms.

141.    FBR intentionally and improperly procured breaches of the Indentures and Trust Declarations by causing the FBR Capital Trusts to purchase the FBR TruPS from the CDOs at discounted prices.  In addition, FBR intentionally and improperly procured breaches of the Indentures by making Side Payments to the Preferred Shareholders instead of to the Trustee on behalf of the CDOs and its creditors for distribution in accordance with the priority of payments waterfall set forth in the Indentures.

142.    FBR acted wrongfully without justification or excuse.

143.    As a direct and proximate cause of FBR's tortious interference, the CDOs have suffered damages in an amount to be determined at trial.

## COUNT VIII: UNJUST ENRICHMENT
### (Individually Against FBR and John Does 1 Through 100)

144.    Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

145.    Hildene brings this Count individually on its own behalf.

146.    As set forth above, FBR and the Preferred Shareholders who consented to the improper sales (the "Doe Defendants") have engaged in wrongful and inequitable conduct that caused, and will continue to cause, injury to Hildene.

147.    As a result of their wrongful and inequitable conduct, FBR and the Doe Defendants have been unjustly enriched.  It would be inequitable and unjust to permit FBR or the Doe Defendants to retain the proceeds of, and profit from, their wrongful conduct.

148.    Hildene is entitled to judgment directing FBR and the Doe Defendants to disgorge the benefits they have received as a result of their wrongful and inequitable conduct.

## COUNT IX: UNJUST ENRICHMENT
### (Derivatively Through Wells Fargo on Behalf of the CDOs Against FBR and John Does 1 Through 100)

149.    Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

150.    Hildene brings this Count derivatively through Wells Fargo, as trustee, on behalf of the CDOs.

151.    As set forth above, FBR and the Preferred Shareholders who consented to the improper sales (the "Doe Defendants") have engaged in wrongful and inequitable conduct that caused, and will continue to cause, injury to the CDOs.

152.    As a result of their wrongful and inequitable conduct, FBR and the Doe Defendants have been unjustly enriched.  It would be inequitable and unjust to permit FBR or the Doe Defendants to retain the proceeds of, and profit from, their wrongful conduct.

153.    The CDOs are entitled to judgment directing FBR and the Doe Defendants to disgorge the benefits they have received as a result of their wrongful and inequitable conduct.

### COUNT X: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Individually Against FBR)

154.    Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

155.    Hildene brings this Count individually on its own behalf.

156.    FBR, as purchaser of the TruPS from the CDOs, aided and abetted the breaches of fiduciary duty by Wells Fargo, as trustee, by knowingly providing material assistance to those breaches.

157.    As described above, FBR had knowledge of Wells Fargo's breaches, including that: (a) the CDOs were static CDOs and that Wells Fargo, as trustee, was prohibited from selling any Portfolio Collateral other than as expressly provided in the Indentures, including at the purported direction of the Preferred Shareholders under section 10.3(d); (b) that the Preferred Shareholders were not authorized to "direct a sale" of the Portfolio Collateral; (c) that Wells Fargo, as trustee, was obligated to collect all proceeds relating to the Portfolio Collateral, including the Side Payments, and distribute them in accordance with the Indentures' waterfall provisions.

158.    As described above, FBR knowingly and substantially assisted in Wells Fargo's breaches of its fiduciary duty to Hildene, including by purchasing the TruPS from the CDOs at a

substantial discount in breach of the Indentures and by paying Side Payments to the Preferred Shareholders to induce their consent to the improper sales.

159.    As a direct, proximate and foreseeable result of FBR's conduct, Hildene has been damaged in an amount to be determined at trial.

### COUNT XI: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Derivatively Through Wells Fargo on Behalf of the CDOs Against FBR)**

160.    Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

161.    Hildene brings this Count derivatively through Wells Fargo, as trustee, on behalf of the CDOs.

162.    FBR, as purchaser of the TruPS from the CDOs, aided and abetted the breaches of fiduciary duty by Wells Fargo, as trustee, by knowingly providing material assistance to those breaches.

163.    As described above, FBR had knowledge of Wells Fargo's breaches, including that: (a) the CDOs were static CDOs and that Wells Fargo, as trustee, was prohibited from selling any Portfolio Collateral other than as expressly provided in the Indentures, including at the purported direction of the Preferred Shareholders under section 10.3(d); (b) that the Preferred Shareholders were not authorized to "direct a sale" of the Portfolio Collateral; (c) that Wells Fargo, as trustee, was obligated to collect all proceeds relating to the Portfolio Collateral, including the Side Payments, and distribute them in accordance with the Indentures' waterfall provisions.

164.    As described above, FBR knowingly and substantially assisted in Wells Fargo's breaches of its fiduciary duty to the CDOs, including by purchasing the TruPS from the CDOs at

a substantial discount in breach of the Indentures and by paying Side Payments to the Preferred Shareholders to induce their consent to the improper sales.

165.    As a direct, proximate and foreseeable result of FBR's conduct, the CDOs have been damaged in an amount to be determined at trial.

### COUNT XII: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (18 U.S.C. §§ 1962(c) and 1964(c))
### (Individually Against FBR Inc.)

166.    Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

167.    Hildene brings this Count individually on its own behalf.

### The FBR RICO Enterprise

168.    Defendant FBR Inc., including its officers, directors, and employees, is a person within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

169.    During all relevant times, for the purposes of this claim, defendant FBR Inc. associated in fact with an enterprise that engaged in activities affecting interstate and foreign commerce.  This enterprise was an association-in-fact that included: (a) FBR Inc. and its business groups, subsidiaries, affiliates, officers, directors, and employees; (b) the statutory trusts established by FBR Inc. or one of its affiliates to issue trust preferred securities, including defendants FBR Capital Trust VI and FBR Capital Trust X; and (c) Defendant Wells Fargo, who acted as trustee for the FBR Capital Trusts and for Tropic III,  Tropic IV, Soloso 2005-1(the "Tropic CDOs")(collectively, the "FBR RICO Enterprise").

170.    For the purposes of this claim, FBR Inc., as a person alleged herein to have violated 18 U.S.C. § 1962(c), is separate from, though associated with, the other persons in the FBR RICO Enterprise.

171.    The FBR RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the defendants engage.

172.    The FBR RICO Enterprise consists of a group of persons associated together for the common purpose of engaging in a course of conduct, the existence of which is proven by their ongoing organization, and by the evidence that demonstrates that the various associates continue to function as a unit for the common purpose.

173.    The common purpose of the FBR RICO Enterprise is to pursue an ongoing strategy to fraudulently extinguish over $300 million of FBR Inc.'s long-term debt in the form of trust preferred securities for a significant gain—and furthermore, to fraudulently conceal documents and evidence from the CDOs' Noteholders who have suffered losses as a result of the Enterprise's racketeering activity.

174.    This purpose came into existence as early as 2008, when FBR announced its strategy to extinguish its long-term debt in the form of trust preferred securities of over $300 million at a reported gain of $200 million.  This common purpose continues to exist today.

175.    Wells Fargo and FBR Inc.'s collaborative conduct in effectuating this common purpose constitutes  substantial evidence that an agreement exists to work together in the FBR RICO Enterprise.  The FBR RICO Enterprise could not have effectuated the its common purpose without Wells Fargo's implicit agreement to abandon its duty as Trustee of the CDOs and the FBR Capital Trusts and join FBR Inc. in the FBR RICO Enterprise.

176.    Thus, Wells Fargo consciously committed itself to the common purpose of the FBR RICO Enterprise as soon as it agreed to abdicate its duties as Trustee and support the FBR RICO Enterprise's use of bribery. The FBR RICO Enterprise was dependent on Wells Fargo's agreement to participate in the FBR RICO Enterprise, including, among other things, to relay

FBR's offer to purchase the TruPS to the CDOs' Preferred Shareholders and to provide FBR Inc. with the identities of each of the Preferred Shareholders who had purported consented to the sales in return for the Side Payments.

177.    Moreover, Wells Fargo's recognition of its duty to file an interpleader action in response to a substantively identical proposal constitutes evidence of its contemporaneous and conscious commitment to disregard that very same duty and instead adopt and adhere to the common purpose of the FBR RICO Enterprise in relation to the sales of the FBR TruPS —a purpose antithetical to Wells Fargo's duty as Trustee.

178.    Wells Fargo's continued attempts to conceal the wrongdoings of the FBR RICO Enterprise in late 2010 and early 2011, including by (a) stating that it did not have possession of the Trust Declarations to which it was a party; and (b) refusing to respond to further requests from Hildene requesting these contracts, demonstrates Wells Fargo's refusal to abandon the FBR RICO Enterprise and comply with its duties as Trustee and shows that the agreement between Wells Fargo and FBR Inc. continues to exist today.

### Racketeering Activity of the FBR RICO Enterprise

179.    The FBR RICO Enterprise is a continuing enterprise engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering by members of the enterprise that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons.

180.    FBR and each of the members of the FBR RICO Enterprise did, and continue to, unlawfully, willfully, and knowingly conduct and participate, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

181.    The multiple acts of racketeering activity committed by the FBR RICO Enterprise to date, as described above, are related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

182.    This "pattern of racketeering activity" is made evident by the consistent activities, as described above, in furtherance of the FBR RICO Enterprise from June 2009 through the filing of this Complaint.

183.    In particular the FBR RICO Enterprise has engaged, and continues to engage, in a pattern of racketeering activity by acting to unlawfully obtain, or attempt to unlawfully obtain the TruPS issued by the FBR Capital Trusts and held by the Tropic CDOs at steeply discounted prices and to terminate its ongoing payment and guarantor obligations with respect to those securities by (a) offering and/or paying bribes to secure the consent of the Tropic CDOs' preferred shareholders, (b) through, among other things, fraudulent pretenses and misrepresentations as the legality of the proposed sales, both under the CDOs' Indentures and under the contracts governing the securities themselves.  The FBR RICO Enterprise has attempted and/or consummated this unlawful scheme at least five times.

184.    Such activity has extended over a substantial period of time, first occurring after the effective date of 18 U.S.C. §§ 1961 et seq., with the most recent act occurring within ten years after the commission of a prior act of racketeering activity.

185.    This activity has been a continuous part of the FBR RICO Enterprise's regular way of conducting business as part of its ongoing strategy to extinguish over $300 of FBR Inc.'s long-term debt in the form of trust preferred securities at a significant gain, announced in October 2008.

186.     The FBR RICO Enterprise was conceived in 2008 and the commission of its first racketeering activity occurred no later than June 9, 2009, when FBR sent letters to Tropic III and Tropic IV, and Wells Fargo subsequently forwarded the letters on—all the while fraudulently misrepresenting that the Indentures and the Trust Declarations permitted FBR's proposed transactions. This racketeering activity was a necessary step in effectuating the FBR RICO Enterprise's purpose to eventually strip the CDOs of their rightful assets and provide FBR with an ill-gotten windfall.

187.     This racketeering activity was repeated on June 10, 2009, when FBR sent a substantially identical letter to Soloso 2005-1, and Wells Fargo once again forwarded the letters along—all the while fraudulently misrepresenting that the Indentures and Trust Declarations permitted FBR's proposed transactions.

188.     Furthermore, the FBR RICO Enterprise has committed further racketeering activity, in the last year, through false communications and misrepresentations designed to conceal the existence of the FBR RICO Enterprise and to ensure that the Enterprise will succeed in its common purpose to prevent the CDOs from recovering the assets that were wrongfully taken from them. The FBR RICO Enterprise has issued further misrepresentations and/or material omissions to perpetuate its unlawful scheme at least twice in the last year.

189.     Because the FBR RICO Enterprise is still making fraudulent misrepresentations designed to mislead the noteholders of the Tropic CDOs and prevent the Tropic CDOs from recovering the assets wrongfully taken from them, the RICO FBR Enterprise presents a continuing threat that, unless stopped, will continue to fraudulent deprive the Tropic CDOs from the assets that are rightfully theirs,

190.    The FBR RICO Enterprise's actions, to date, have thus consisted of multiple, related acts of:

(a)    <u>Commercial Bribery</u>

191.    FBR Inc. and the other members of the FBR RICO Enterprise engaged and conspired to engage in, at least five acts of commercial bribery by offering to pay, and/or paying the Preferred Shareholders of the Tropic CDOs cash inducements in return for their consent to the proposed sales of TruPS issued by the FBR Capital Trusts at steeply discounted prices.

192.    In particular, FBR Inc. offered to confer and/or did confer cash payments on the majority Preferred Shareholders of the Tropic CDOs without the consent of either (a) the CDOs' Noteholders or (b) the minority Preferred Shareholders, with intent that this would influence the Preferred Shareholders to consent to the sales of the select CDO assets.  The majority Preferred Shareholders, as purported controlling shareholders in relation to the sale of assets held by the CDOs owed fiduciary duties to (a) the CDOs' senior noteholders and (b) the minority Preferred Shareholders, in the exercise of these purported controlling rights.

193.    Commercial Bribery is chargeable under New York law and punishable by imprisonment for more than one year.

(b)    <u>Mail Fraud</u>

194.    FBR Inc. and other members of the FBR RICO Enterprise, knowingly engaged or attempted to engage in a scheme to defraud and/or to obtain money or property by means of fraudulent pretenses and fraudulent misrepresentations.  In particular, FBR Inc. and the other members of the FBR RICO Enterprise engaged in a scheme to obtain the tTruPS issued by the FBR Capital Trusts from the Tropic CDOs at steeply discounted prices and to terminate FBR's

ongoing payment and guarantor obligations in relation to the select securities  by fraudulently misrepresenting, on multiple occasions, to the Preferred Shareholders of the CDOs that:

    a)      the sale of the TruPS to the FBR Trusts was permitted under the CDOs' Indentures;

    b)      the Preferred Shareholders were empowered to consent to the sale and direct the Trustee to sell the TruPS to FBR; and

    c)      the FBR Capital Trusts were lawfully permitted to repurchase their own securities.

195.   The FBR RICO Enterprise carried out its fraudulent scheme by use of the U.S. mails for the purpose of obtaining money and/or property by, among other things, FBR sending offer letters to the Trustee of the CDOs and the Trustee sending letters and notices to the Preferred Shareholders notifying them of FBR's offers, as set forth above.  Such actions are in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2.

    (c)   <u>Wire Fraud</u>

196.   FBR Inc. and other members of the FBR RICO Enterprise, knowingly engaged or attempted to engage in a scheme to defraud and/or to obtain money or property by means of fraudulent pretenses and fraudulent misrepresentations.  In particular, FBR Inc. and the other members of the FBR RICO Enterprise engaged in a scheme to obtain the TruPS issued by the FBR Capital Trusts from the Tropic CDOs at steeply discounted prices and to terminate FBR's ongoing payment and guarantor obligations in relation to the TruPS by fraudulently misrepresenting, on multiple occasions, to the Preferred Shareholders of the CDOs that:

    a)      the sale of the TruPS to the FBR Trusts was permitted under the CDOs' Indentures;

    b)      the Preferred Shareholders were empowered to consent to the sale and direct the Trustee to sell the TruPS to FBR; and

    c)      the FBR Capital Trusts were lawfully permitted to repurchase their own securities.

197.    FBR Inc. and the other members of the FBR RICO Enterprise carried out its fraudulent scheme by use of interstate and foreign wires for the purpose of obtaining money and/or property by, among other things, paying the Preferred Shareholders of Tropic III, Tropic IV, and Soloso 2005-1 bribes in return for their consent to the sales and paying Tropic III, Tropic IV, and Soloso 2005-1 CDOs the purchase price for the select securities.  Such actions are in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2.

198.    Most recently, Wells Fargo and other members of the FBR RICO Enterprise have knowingly engaged in a scheme, through interstate and foreign wires, to further defraud the CDOs' Noteholders through fraudulent pretenses and fraudulent misrepresentations designed to conceal and hide the Enterprise's possession of key transaction documents that reveal the illegality of the FBR RICO Enterprise's racketeering activity.

### The FBR RICO Enterprise, and FBR, Caused Injury to Hildene

199.    Hildene, as Noteholder of the CDOs has been injured in their business or property as a direct and proximate result of FBR Inc. and the FBR RICO Enterprise's violations described above of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

200.    Hildene's injuries are clear and definite and include the loss of $35 million in valuable performing assets, as well as the ongoing loss of principal and interest payments in respect of those assets, which constitute the secured collateral for their Notes in the CDOs..

### Hildene's Entitlement to Treble Damages

201.    As a result of the violations of 18 U.S.C. § 1962(c) by FBR Inc. and other members of the FBR RICO Enterprise, Hildene has suffered substantial damages in an amount to be proven at trial.

202.    Pursuant to 18 U.S.C. § 1964(c), Hildene is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of FBR's violations of 18 U.S.C. § 1962(c).

### COUNT XIII: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (18 U.S.C. §§ 1962(c) and 1964(c))
### (Derivatively Through Wells Fargo on Behalf of the CDOs Against FBR Inc.)

203.    Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

204.    Hildene brings this Count derivatively through Wells Fargo, as trustee, on behalf of the CDOs..

### The FBR RICO Enterprise

205.    Defendant FBR Inc., including its officers, directors, and employees, is a person within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

206.    During all relevant times, for the purposes of this claim, defendant FBR Inc. associated in fact with an enterprise that engaged in activities affecting interstate and foreign commerce.  This enterprise was an association-in-fact that included: (a) FBR Inc. and its business groups, subsidiaries, affiliates, officers, directors, and employees; (b) the statutory trusts established by FBR Inc. or one of its affiliates to issue trust preferred securities, including defendants FBR Capital Trust VI and FBR Capital Trust X; and (c) Defendant Wells Fargo, who acted as trustee for the FBR Capital Trusts and for Tropic III,  Tropic IV, Soloso 2005-1(the "Tropic CDOs")(collectively, the "FBR RICO Enterprise").

207.    For the purposes of this claim, FBR Inc., as a person alleged herein to have violated 18 U.S.C. § 1962(c), is separate from, though associated with, the other persons in the FBR RICO Enterprise.

208.    The FBR RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the defendants engage.

209.    The FBR RICO Enterprise consists of a group of persons associated together for the common purpose of engaging in a course of conduct, the existence of which is proven by their ongoing organization, and by the evidence that demonstrates that the various associates continue to function as a unit for the common purpose.

210.    The common purpose of the FBR RICO Enterprise is to pursue an ongoing strategy to fraudulently extinguish over $300 million of FBR Inc.'s long-term debt in the form of trust preferred securities for a significant gain—and furthermore, to fraudulently conceal documents and evidence from the CDOs and its Noteholders who have suffered losses as a result of the Enterprise's racketeering activity.

211.    This purpose came into existence as early as 2008, when FBR announced its strategy to extinguish its long-term debt in the form of trust preferred securities of over $300 million at a reported gain of $200 million.  This common purpose continues to exist today.

212.    Wells Fargo and FBR Inc.'s collaborative conduct in effectuating this common purpose constitutes  substantial evidence that an agreement exists to work together in the FBR RICO Enterprise.  The FBR RICO Enterprise could not have effectuated the its common purpose without Wells Fargo's implicit agreement to abandon its duty as Trustee of the CDOs and the FBR Capital Trusts and join FBR Inc. in the FBR RICO Enterprise.

213.    Thus, Wells Fargo consciously committed itself to the common purpose of the FBR RICO Enterprise as soon as it agreed to abdicate its duties as Trustee and support the FBR RICO Enterprise's use of bribery. The FBR RICO Enterprise was dependent on Wells Fargo's agreement to participate in the FBR RICO Enterprise, including, among other things, to relay

FBR's offer to purchase the TruPS to the CDOs' Preferred Shareholders and to provide FBR Inc. with the identities of each of the Preferred Shareholders who had purported consented to the sales in return for the Side Payments.

214.    Moreover, Wells Fargo's recognition of its duty to file an interpleader action in response to a substantively identical proposal constitutes evidence of its contemporaneous and conscious commitment to disregard that very same duty and instead adopt and adhere to the common purpose of the FBR RICO Enterprise in relation to the sales of the FBR TruPS —a purpose antithetical to Wells Fargo's duty as Trustee.

215.    Wells Fargo's continued attempts to conceal the wrongdoings of the FBR RICO Enterprise in late 2010 and early 2011, including by (a) stating that it did not have possession of the Trust Declarations to which it was a party; and (b) refusing to respond to further requests from Hildene requesting these contracts, demonstrates Wells Fargo's refusal to abandon the FBR RICO Enterprise and comply with its duties as Trustee and shows that the agreement between Wells Fargo and FBR Inc. continues to exist today.

### Racketeering Activity of the FBR RICO Enterprise

216.    The FBR RICO Enterprise is a continuing enterprise engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering by members of the enterprise that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons.

217.    FBR and each of the members of the FBR RICO Enterprise did, and continue to, unlawfully, willfully, and knowingly conduct and participate, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

218.    The multiple acts of racketeering activity committed by the FBR RICO Enterprise to date, as described above, are related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

219.    This "pattern of racketeering activity" is made evident by the consistent activities, as described above, in furtherance of the FBR RICO Enterprise from June 2009 through the filing of this Complaint.

220.    In particular the FBR RICO Enterprise has engaged, and continues to engage, in a pattern of racketeering activity by acting to unlawfully obtain, or attempt to unlawfully obtain the TruPS issued by the FBR Capital Trusts and held by the Tropic CDOs at steeply discounted prices and to terminate its ongoing payment and guarantor obligations with respect to those securities by (a) offering and/or paying bribes to secure the consent of the Tropic CDOs' preferred shareholders, (b) through, among other things, fraudulent pretenses and misrepresentations as the legality of the proposed sales, both under the CDOs' Indentures and under the contracts governing the securities themselves.  The FBR RICO Enterprise has attempted and/or consummated this unlawful scheme at least five times.

221.    Such activity has extended over a substantial period of time, first occurring after the effective date of 18 U.S.C. §§ 1961 et seq., with the most recent act occurring within ten years after the commission of a prior act of racketeering activity.

222.    This activity has been a continuous part of the FBR RICO Enterprise's regular way of conducting business as part of its ongoing strategy to extinguish over $300 of FBR Inc.'s long-term debt in the form of trust preferred securities at a significant gain, announced in October 2008.

223. The FBR RICO Enterprise was conceived in 2008 and the commission of its first racketeering activity occurred no later than June 9, 2009, when FBR sent letters to Tropic III and Tropic IV, and Wells Fargo subsequently forwarded the letters on—all the while fraudulently misrepresenting that the Indentures and the Trust Declarations permitted FBR's proposed transactions. This racketeering activity was a necessary step in effectuating the FBR RICO Enterprise's purpose to eventually strip the CDOs of their rightful assets and provide FBR with an ill-gotten windfall.

224. This racketeering activity was repeated on June 10, 2009, when FBR sent a substantially identical letter to Soloso 2005-1, and Wells Fargo once again forwarded the letters along—all the while fraudulently misrepresenting that the Indentures and Trust Declarations permitted FBR's proposed transactions.

225. Furthermore, the FBR RICO Enterprise has committed further racketeering activity, in the last year, through false communications and misrepresentations designed to conceal the existence of the FBR RICO Enterprise and to ensure that the Enterprise will succeed in its common purpose to prevent the CDOs from recovering the assets that were wrongfully taken from them. The FBR RICO Enterprise has issued further misrepresentations and/or material omissions to perpetuate its unlawful scheme at least twice in the last year.

226. Because the FBR RICO Enterprise is still making fraudulent misrepresentations designed to mislead the noteholders of the Tropic CDOs and prevent the Tropic CDOs from recovering the assets wrongfully taken from them, the RICO FBR Enterprise presents a continuing threat that, unless stopped, will continue to fraudulent deprive the Tropic CDOs from the assets that are rightfully theirs.

227.    The FBR RICO Enterprise's actions, to date, have thus consisted of multiple, related acts of:

(a)    Commercial Bribery

228.    FBR Inc. and the other members of the FBR RICO Enterprise engaged and conspired to engage in, at least five acts of commercial bribery by offering to pay, and/or paying the Preferred Shareholders of the Tropic CDOs cash inducements in return for their consent to the proposed sales of TruPS issued by the FBR Capital Trusts at steeply discounted prices.

229.    In particular, FBR Inc. offered to confer and/or did confer cash payments on the majority Preferred Shareholders of the Tropic CDOs without the consent of either (a) the CDOs' Noteholders or (b) the minority Preferred Shareholders, with intent that this would influence the Preferred Shareholders to consent to the sales of the select CDO assets.  The majority Preferred Shareholders, as purported controlling shareholders in relation to the sale of assets held by the CDOs owed fiduciary duties to (a) the CDOs' senior noteholders and (b) the minority Preferred Shareholders, in the exercise of these purported controlling rights.

230.    Commercial Bribery is chargeable under New York law and punishable by imprisonment for more than one year.

(b)    Mail Fraud

231.    FBR Inc. and other members of the FBR RICO Enterprise, knowingly engaged or attempted to engage in a scheme to defraud and/or to obtain money or property by means of fraudulent pretenses and fraudulent misrepresentations.  In particular, FBR Inc. and the other members of the FBR RICO Enterprise engaged in a scheme to obtain the tTruPS issued by the FBR Capital Trusts from the Tropic CDOs at steeply discounted prices and to terminate FBR's

ongoing payment and guarantor obligations in relation to the select securities by fraudulently misrepresenting, on multiple occasions, to the Preferred Shareholders of the CDOs that:

a)       the sale of the TruPS to the FBR Trusts was permitted under the CDOs' Indentures;

b)       the Preferred Shareholders were empowered to consent to the sale and direct the Trustee to sell the TruPS to FBR; and

c)       the FBR Capital Trusts were lawfully permitted to repurchase their own securities.

232.     The FBR RICO Enterprise carried out its fraudulent scheme by use of the U.S. mails for the purpose of obtaining money and/or property by, among other things, FBR sending offer letters to the Trustee of the CDOs and the Trustee sending letters and notices to the Preferred Shareholders notifying them of FBR's offers, as set forth above. Such actions are in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2.

(c)     <u>Wire Fraud</u>

233.     FBR Inc. and other members of the FBR RICO Enterprise, knowingly engaged or attempted to engage in a scheme to defraud and/or to obtain money or property by means of fraudulent pretenses and fraudulent misrepresentations. In particular, FBR Inc. and the other members of the FBR RICO Enterprise engaged in a scheme to obtain the TruPS issued by the FBR Capital Trusts from the Tropic CDOs at steeply discounted prices and to terminate FBR's ongoing payment and guarantor obligations in relation to the TruPS by fraudulently misrepresenting, on multiple occasions, to the Preferred Shareholders of the CDOs that:

a)       the sale of the TruPS to the FBR Trusts was permitted under the CDOs' Indentures;

b)       the Preferred Shareholders were empowered to consent to the sale and direct the Trustee to sell the TruPS to FBR; and

c)       the FBR Capital Trusts were lawfully permitted to repurchase their own securities.

234.    FBR Inc. and the other members of the FBR RICO Enterprise carried out its fraudulent scheme by use of interstate and foreign wires for the purpose of obtaining money and/or property by, among other things, paying the Preferred Shareholders of Tropic III, Tropic IV, and Soloso 2005-1 bribes in return for their consent to the sales and paying Tropic III, Tropic IV, and Soloso 2005-1 CDOs the purchase price for the select securities.  Such actions are in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2.

235.    Most recently, Wells Fargo and other members of the FBR RICO Enterprise have knowingly engaged in a scheme, through interstate and foreign wires, to further defraud the CDOs' Noteholders through fraudulent pretenses and fraudulent misrepresentations designed to conceal and hide the Enterprise's possession of key transaction documents that reveal the illegality of the FBR RICO Enterprise's racketeering activity.

### The FBR RICO Enterprise, and FBR, Caused Injury to the CDOs

236.    The CDOs have been injured in their business or property as a direct and proximate result of FBR Inc. and the FBR RICO Enterprise's violations described above of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

237.    The CDOs' injuries are clear and definite and include the loss of $35 million in valuable performing assets for a steep discount, as well as the ongoing loss of principal and interest payments due to the CDOs' in respect of those assets.

### The CDOs' Entitlement to Treble Damages

238.    As a result of the violations of 18 U.S.C. § 1962(c) by FBR Inc. and other members of the FBR RICO Enterprise, the CDOs have suffered substantial damages in an amount to be proven at trial.

239.     Pursuant to 18 U.S.C. § 1964(c), the CDOs are entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of FBR's violations of 18 U.S.C. § 1962(c).

## COUNT XIV: CONSPIRACY TO VIOLATE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (18 U.S.C. §§ 1962(d) and 1964(c))
### (Individually Against FBR Inc. and Wells Fargo)

240.     Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

241.     Hildene brings this Count individually on its own behalf.

242.     During all relevant times for the purposes of this claim, FBR Inc. and the other members of the FBR RICO Enterprise, including the Wells Fargo, as trustee, (the "Conspirators") engaged in activities which affected interstate commerce and actively, willfully, knowingly, and unlawfully conspired, combined, confederated, and agreed together to violate 18 U.S.C. § 1962(c).

243.     These Conspirators were and are associated in fact with the FBR RICO Enterprise that engaged in activities affecting interstate and foreign commerce.  Specifically, the FBR RICO Enterprise, constituting a group of persons and entities associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the enterprise's affairs through a pattern of racketeering activity.

244.     The pattern of racketeering activity, as defined by 13 U.S.C. § 1961(1) and (5), included multiple and related acts of commercial bribery, mail fraud and wire fraud, as described above.

245.     The nature of the above described acts in furtherance of the conspiracy establish that Conspirators (1) intended to violate 18 U.S.C. § 1962(d), (2) by conspiring to violate 18

U.S.C. § 1962(c), and (3) were aware that their actions were part of an overall pattern of racketeering activity.

246.    Hildene has been injured in its business or property by reasons of FBR's violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering injury.

247.    Pursuant to 18 U.S.C. § 1964(c), Hildene is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees, by reason of Conspirators' violation of 18 U.S.C. § 1962(d).

### COUNT XV: CONSPIRACY TO VIOLATE RACKEETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (18 U.S.C. §§ 1962(d) and 1964(c))
### (Derivatively on Behalf of the CDOs Against FBR Inc. and Wells Fargo)

248.    Hildene repeats and realleges the foregoing allegations as though they were fully set forth here.

249.    Hildene brings this Count derivatively through Wells Fargo, as trustee, on behalf of the CDOs.

250.    During all relevant times for the purposes of this claim, FBR Inc. and the other members of the FBR RICO Enterprise, including the Wells Fargo, as trustee, (the "Conspirators") engaged in activities which affected interstate commerce and actively, willfully, knowingly, and unlawfully conspired, combined, confederated, and agreed together to violate 18 U.S.C. § 1962(c).

251.    These Conspirators were and are associated in fact with the FBR RICO Enterprise that engaged in activities affecting interstate and foreign commerce.  Specifically, the FBR RICO Enterprise, constituting a group of persons and entities associated-in-fact, did unlawfully,

willfully, and knowingly participate in and conduct, directly and indirectly, the enterprise's affairs through a pattern of racketeering activity.

252.   The pattern of racketeering activity, as defined by 13 U.S.C. § 1961(1) and (5), included multiple and related acts of commercial bribery, mail fraud and wire fraud, as described above.

253.   The nature of the above described acts in furtherance of the conspiracy establish that Conspirators (1) intended to violate 18 U.S.C. § 1962(d), (2) by conspiring to violate 18 U.S.C. § 1962(c), and (3) were aware that their actions were part of an overall pattern of racketeering activity.

254.   The CDOs have been injured in its business or property by reasons of FBR's violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering injury.

255.   Pursuant to 18 U.S.C. § 1964(c), the CDOs are entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees, by reason of Conspirators' violation of 18 U.S.C. § 1962(d).

### PRAYER FOR RELIEF

**WHEREFORE**, Hildene, individually and derivatively through Wells Fargo, as trustee, on behalf of the CDOs, respectfully requests judgment against the Defendants as follows:

A.   Compensatory and punitive damages, in an amount to be determined at trial;

B.   Treble damages pursuant to 18 U.S.C. § 1964(c);

B.   Disgorgement of any profits and other enrichment unjustly obtained by FBR or the Doe Defendants;

C.      The costs of this action, including attorney's fees;

D.      Awarding to Plaintiff and the CDOs such other and further relief, in law and

equity, as this Court deems just and proper.

Dated:   New York, New York
         December 14, 2011

Respectfully submitted,

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By:  _____
       Jonathan E. Pickhardt
       Simona Gory

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*jonpickhardt@quinnemanuel.com*
*simonagory@quinnemanuel.com*

*Attorneys for Plaintiffs Hildene Capital*
*Management, LLC and Hildene*
*Opportunities Master Fund, Ltd.*

OFFICE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HILDENE CAPITAL MANAGEMENT,
LLC, and HILDENE OPPORTUNITIES
MASTER FUND, LTD., individually and
derivatively,

               Plaintiff,

   -against-

FRIEDMAN, BILLINGS, RAMSEY
GROUP, INC. (d/b/a ARLINGTON ASSET
INVESTMENT CORP.), FBR CAPITAL
TRUST VI, FBR CAPITAL TRUST X,
WELLS FARGO BANK, N.A., and JOHN
AND JANE DOES 1 THROUGH 100

               Defendants,

and WELLS FARGO BANK, N.A., as trustee
for TROPIC III CDO LTD., TROPIC IV
CDO LTD., and SOLOSO CDO 2005-1
LTD.,

               Nominal Defendant.

11 Civ. 5832 (JGK)



## Certificate of Service

     The undersigned hereby certifies under the penalty of perjury that a true and correct copy of Plaintiff's Amended Complaint, dated December 14, 2011, and the exhibits thereto, was caused to be served via First Class Mail on this 14th day of December, 2011, on the below-listed persons.

Kelly M. Hnatt, Esq.
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099

Edward J. Fuhr, Esq.
Eric H. Feiler
Hunton & Williams LLP

Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074

*Counsel for Defendants Friedman, Billings, Ramsey Group Inc. (d/b/a Arlington Asset Investment Corp.), FBR Capital Trust VI, and FBR Capital Trust X*

Eric Seiler, Esq.
Andrew W. Goldwater, Esq.
Freidman Kaplan Seiler & Adelman LLP
7 Times Square
New York, NY 10036

*Counsel for Defendant Wells Fargo Bank, N.A.*

Dated:   New York, New York
         December 14, 2011

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By: _____
        Jonathan E. Pickhardt

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*jonpickhardt@quinnemanuel.com*

*Counsel for Plaintiff Hildene Capital Management, LLC.*