```
                                              ┌─────────────────────────────────┐
                                              │ USDC SDNY                       │
                                              │ DOCUMENT                        │
UNITED STATES DISTRICT COURT                  │ ELECTRONICALLY FILED            │
SOUTHERN DISTRICT OF NEW YORK                 │ DOC #:_____           │
-------------------------------------------X  │ DATE FILED: AUG 1 5 2012        │
                                           :  └─────────────────────────────────┘
HILDENE CAPITAL MANAGEMENT, LLC, AND       :
HILDENE OPPORTUNITIES MASTER FUND, LTD.,    :
               Plaintiff,                   :        11 Civ. 5832 (AJN)
                                           :
        -v-                                 :            OPINION
                                           :
                                           :
FRIEDMAN, BILLINGS, RAMSEY GROUP, INC.,  ET :
AL,                                         :
               Defendants.                  :
                                           :
------------------------------------------X
```

ALISON J. NATHAN, District Judge:

Defendants Friedman, Billings, Ramsey Group, Inc. ("FBR Inc."), FBR Capital Trust VI and FBR Capital Trust X (collectively, the "FBR Capital Trusts") and Wells Fargo Bank, N.A. ("Wells Fargo"), have filed motions to dismiss Hildene Capital Management, LLC and Hildene Opportunities Master Fund, Ltd.'s ("Hildene") Amended Complaint. The Court GRANTS IN PART and DENIES IN PART Defendants' motions to dismiss.

## BACKGROUND

This case arises out of transactions related to the FBR Capital Trust's purchase of assets held by certain CDOs, namely Tropic CDO III, Ltd., Tropic CDO IV Ltd. and Soloso CDO 2005-1 Ltd (the "CDOs"), all of which are Cayman Islands corporations. (Am. Compl. ¶¶ 1-2; Tropic III Indenture at 1; Tropic IV Indenture at 1; Soloso Indenture at 1). The operation of each CDO is controlled by similar indentures issued in 2004 and 2005, governed by New York law.[1] (Ind. § 13.10).

---

[1] Relevant differences in the indentures are discussed where they arise.

The CDOs generate income from a portfolio of underlying assets (the "Portfolio Collateral"), which income is then paid out in a "waterfall" to investors holding securities issued by the CDO in tranches corresponding to varying degrees of risk. (Am. Compl. ¶ 3). Particularly relevant to this case are the most junior stakeholders (the "Preferred Shareholders") who hold only equity in the CDO, are at the bottom of the "waterfall" of payments, and thus are the first to bear any losses if the underlying assets fail to perform. (Am. Compl. ¶ 3). Wells Fargo holds the Portfolio Collateral as trustee for the secured parties—particularly, according to Hildene, for the benefit of the investors with senior interests (the "Noteholders"), and not the Preferred Shareholders. (Am. Compl. ¶¶ 31-32, 49-50).

At one time, the Portfolio Collateral included $35 million in debt securities (the "TruPS") issued by the FBR Capital Trusts. (Am. Compl. ¶¶ 4, 33.) Hildene alleges that the Portfolio Collateral was "intended to remain 'static'" and could be sold only under specific circumstances set forth in the indentures. (Comp. ¶¶ 3, 36.) In 2009, Hildene contends, the FBR Capital Trusts purported to re-purchase the TruPS for a total of just $5.25 million. The FBR Capital Trusts took this action through Section 10.3(d) of the governing indentures, which provides that

> [t]he Trustee [Wells Fargo] on behalf of the Issuer shall notify the Holders of the Preferred Shares of any Portfolio Collateral that is subject to an Offer. If no Event of Default has occurred and is continuing, and subject to the provisions of Article XII hereof, the Holders representing at least 66-2/3% of the Preferred Shares may direct the Trustee to release from the lien of this Indenture such Portfolio Collateral in accordance with the terms of the Offer in each case against receipt of payment therefor.

(Indentures § 10.3(d).) FBR sent letters relaying offers under Section 10.3(d) to purchase the TruPS to the CDOs and Wells Fargo. (Am. Compl. ¶ 38.) In addition to the $5.25 million FBR offered the CDOs as payment for the debt securities, FBR also offered the Preferred

Shareholders "side payments" of $1.75 million to induce them to agree to the transaction, payments that Hildene characterizes as "bribes." (Am. Compl. ¶¶ 37-38.)

Wells Fargo relayed FBR's offer to the Preferred Shareholders, notifying them of their 'purported 'right to direct the Trustee whether to accept such an Offer" under Section 10.3(d), but did not notify Hildene or the rest of the CDO's more senior investors of this offer. (Am. Compl. ¶ 42.) Three months later, Wells Fargo sent a notice to all shareholders that the requisite 66-2/3% of Preferred Shareholders had directed it to accept the offer and that the offer had been accepted. (Am. Compl. ¶ 44.).

Hildene asserts several claims against FBR for pursuing this transaction and against Wells Fargo for allowing it. The fifteen causes of action that Plaintiffs raise can be divided into three broad categories: claims asserting that the transaction violated the indentures or other governing documents or otherwise unjustly enriched one or more of the Defendants; claims asserting that the transaction caused Wells Fargo to breach its fiduciary duty to Plaintiffs; and claims arising under the Racketeering Influenced and Corrupt Organizations Act ("RICO"). A number of these claims are brought derivatively "through nominal defendant Wells Fargo." (Am. Complaint at 1).

## DISCUSSION

## I.   LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In considering a motion to dismiss, the Court must accept as true all facts alleged in the complaint, and must draw all reasonable inferences in favor of the plaintiff. *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496

F.3d 229, 237 (2d Cir. 2007). In addition to allegations in the complaint itself, the Court may

consider documents attached to the complaint as exhibits and documents incorporated by

reference in the complaint. *Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011); *Chapman v.*

*N.Y. State Div. for Youth*, 546 F.3d 230, 234 (2d Cir. 2008).

## II.    DERIVATIVE CLAIMS

Because a number of Hildene's claims are brought derivatively and may be subject to

dismissal if Hildene cannot properly assert such claims, it is worth considering these claims at

the outset. At oral argument Hildene explained that it was not attempting to bring a "double

derivative" claim to step into the shoes of the CDOs. (6/4/12 Tr. at 37:7-38:23). Rather, "the only

derivative claim that [Hildene is] asserting is that [it may] step into the shoes of Wells Fargo

because Wells Fargo failed to act," a derivative claim that Hildene contends is permitted by

'longstanding New York law." (6/4/12 Tr. at 38:20-23.) Thus, whether Hildene could step into

the shoes of the CDOs, or whether Cayman Islands law would preclude such a derivative claim,

*see Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466, 475-76 (S.D.N.Y. 2011), is not at issue.

Defendants raise several arguments arguing that Hildene's derivative claims must be

dismissed, including that Hildene failed to allege that it made a pre-suit demand that Wells Fargo

institute an action to protect the rights of the CDOs, as required by Federal Rule of Civil

Procedure 23.1 and New York Business Corporation Law § 626(a).[2] Hildene contends that it

was not required to make such a demand because this case involves a trust, rather than a

---

[2] The parties have briefed the issue of demand based on New York law and do not appear to dispute its applicability. (Wells Fargo Mtn. at 22-23; Opp. at 32-34; Wells Fargo Reply at 12-14); *Karnauskas v. Columbia Sussex Corp.*, No. 09-cv-7104, 2012 U.S. Dist. LEXIS 8988, at *6 (S.D.N.Y. Jan. 24, 2012) (applying Arizona law because parties did not dispute choice of law and both applied Arizona law in their briefs); *Mason Tenders Dist. Council of Greater N.Y. v. Concore Equip., Inc.*, No. 10-cv-4227, 2011 U.S. Dist. LEXIS 132200, at *27 n.2 (S.D.N.Y. Nov. 10, 2011) (parties did not dispute that New York law applied); *Silverman Partners LP v. Verox Group*, No. 08-cv-3103, 2010 U.S. Dist. LEXIS 71977, at *9 n.4 (S.D.N.Y. July 16, 2010).

corporation and, by their terms, the provisions Wells Fargo relies on apply only to corporations. (Opp. at 33 n.14). However, a plethora of cases at both the federal and state level have applied a demand requirement to trust beneficiaries seeking to bring derivative suits by stepping into the shoes of the trustee. *See, e.g.*, *CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 477 (S.D.N.Y. 2010) (applying demand requirement to derivative suit brought on behalf of trustee); *BNP Paribas Mortg. Corp. v. Bank of Am.*, N.A., No. 10-cv-8630, 2011 U.S. Dist. LEXIS 97596, at *26 n.8 (S.D.N.Y. Aug. 25, 2011) ("[P]laintiffs must generally plead demand and refusal or excuse for not making such demand."); *Henry v. Von Elbe*, No. 04-cv-201, 2005 U.S. Dist. LEXIS 44248, at *13 (N.D.N.Y Aug. 25, 2005); *Dallas Cowboys Football Club v. NFL Trust*, No. 95-cv-9426, 1996 U.S. Dist. LEXIS 15501, at *7 (S.D.N.Y. Oct. 18, 1996); *Benenson v. Fleischman,* No. 94-cv-5009, 1995 U.S. Dist. LEXIS 6636, at *13 (S.D.N.Y. May 17, 1995); *Besser v. Miller*, 12 A.D.3d 1118, 1118 (N.Y. App. Div. 4th Dep't 2004); *Velez v. Feinstein*, 87 A.D.2d 309, 315 (N.Y. App. Div. 1st Dep't 1982); *Levy v. Carver Fed. S&L Ass'n*, 18 A.D.2d 1062, 1062 (N.Y. App. Div. 1st Dep't 1963). Hildene has not cited any contrary precedent or provided a persuasive reason to depart from the approach of these cases.

Hildene's other attempt to save its derivative claims is to argue that demand was excused because "the institution of proceedings . . . would implicate Wells Fargo because it permitted and facilitated the FBR Sales" and thus Wells Fargo "may be substantially liable for its conduct." (Opp. at 33-34). However, the test for demand futility articulated by the New York Court of Appeals in *Marx v. Akers*, 88 N.Y.2d 189, 198 (1996), does not contemplate excusing demand merely because the trustee may potentially be liable. *Marx* held that demand is futile when "(1) a majority of the directors are interested in the transaction, or (2) the directors failed to inform themselves to a degree reasonably necessary about the transaction, or (3) the directors failed to

5

exercise their business judgment in approving the transaction." *Id.* As relevant to this case, *Marx* explained that the first prong was met when a director "will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally." *Id.* at 200.  Merely naming directors (or the trustee) as defendants or alleging that they may be liable is not sufficient to render demand futile. *See id.* at 200 (noting cases that had "unfortunately . . . overlooked the explicit warning" of a prior Court of Appeals decision holding that merely naming a majority of the board of directors as defendants does not excuse demand, including a case that had stated that no demand was necessary if the complaint alleges acts for which a majority of directors may be liable); *see also Bansbach v. Zinn*, 1 N.Y.3d 1, 11 (2003); *Teamsters Allied Benefit Funds v. McGraw-Hill Companies, Inc.*, No. 09-cv-140, 2010 U.S. Dist. LEXIS 23052, at *21-22 (S.D.N.Y. Mar. 10, 2010); *M+J Savitt, Inc. v. Savitt*, No. 08-cv-8535, 2009 U.S. Dist. LEXIS 21321, at *14-15 (S.D.N.Y. Mar. 17, 2009); *Wandel ex rel. Bed Bath & Beyond, Inc. v. Eisenberg*, 871 N.Y.S.2d 102, 105 (1st Dep't 2009) ("The bare claim that the directors who served on the stock option and compensation committees should be viewed as interested because they are 'substantially likely to be held liable' for their actions is not enough."); *Kahn v Ran*, No. 601288-11 2012 N.Y. Misc. LEXIS 2908, at *12-13 (N.Y. Sup. Ct. June 12, 2012).  As the New York Court of Appeals explained in *Marx*, the problem with excusing the demand requirement merely because a plaintiff has alleged such liability is that "it permits plaintiffs to frame their complaint in such a way as to automatically excuse demand, thereby allowing the exception to swallow the rule." 88 N.Y.2d at 200; *see also Wandel v. Eisenberg*, 871 N.Y.S.2d 102, 105 (N.Y. App. Div. 1st Dep't 2009).  Although Plaintiffs cite a trial-level New York court that has reached a contrary conclusion, *see Hecht v Andover Assoc. Mgt. Corp.*, 2010 N.Y. Misc. LEXIS 638

(N.Y. Sup. Ct. 2010),[3] the weight of authority establishes that merely alleging the trustee's potential exposure to liability does not excuse demand.

Accordingly, the Court dismisses Hildene's derivative claims, Counts II, III, V, VII, IX, XI, XIII, and XV of the Amended Complaint.  Because the Court notes that the parties had stipulated to a schedule allowing Plaintiffs an opportunity to amend their Complaint in light of the motions to dismiss (D.E. 22), an opportunity that Plaintiffs took advantage of (D.E. 27), the Court therefore dismisses these claims with prejudice.

## III.  CONTRACTUAL, QUASI-CONTRACTUAL, AND CONTRACT-RELATED CLAIMS

Hildene has raised a number of claims through which it contends that the Defendants violated the indentures, caused the indentures to be violated, or were unjustly enriched by the sale of the TruPS.  Although not all of these claims strictly fall into the rubric of "breach of contract," certain portions of the analysis underlying Hildene's claims for tortious interference with contract and unjust enrichment are sufficiently related to its breach of contract claims to bear consideration alongside those claims.

### A.  Breach of Contract

In Count I of its Amended Complaint, Hildene alleges that Wells Fargo breached the indentures by allowing the sale of the TruPS to the FBR Capital Trusts.  As explained below, although some of Hildene's breach of contract theories fail as a matter of law, one such theory—that the sale of the TruPS was not authorized under Section 10.3(d)—is sufficient to survive Defendants' motions to dismiss.

---

[3] Plaintiffs also cite *Miller v. Schreyer*, 1992 WL 456656, at *2 (N.Y. Sup. Ct. Oct. 30, 1992), on this point, but *Marx* appears to have specifically rejected this case.  *See Marx*, 88 N.Y.2d at 200 (citing *Miller* as an example of a case overlooking the warnings in the court's previous holdings and explaining the problem with this approach that led it to clarify the appropriate test).

### 1.  Principles of Contract Interpretation

"The threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous. Under New York law, the meaning of a contract that is unambiguous is a question of law for the court to decide." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (citations omitted).  If a contract is unambiguous, a court may resolve its construction on a motion to dismiss. *See, e.g.,  JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009); (determination of whether a contract is ambiguous is a question of law for the court; meaning of unambiguous contract is also to be determined as a matter of law); *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990).

"Contract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Revson*, 221 F.3d at 66 (quotation marks omitted; alterations in the original).   "Ambiguous language is language that is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement . . . ." *Id.*  Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations unless each is a reasonable interpretation. *Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010); *JA Apparel*, 568 F.3d 390, 396-97 (2d Cir. 2009).

In a contract action, the court's objective should be to give effect to the intentions of the parties in entering into the agreements. *Metropolitan Life Ins. Co.*, 906 F.2d at 889 (2d Cir. 1990).  A contract should be read as a whole to ensure that undue emphasis is not placed on particular words and phrases and to avoid an interpretation that would render a provision

superfluous. *Law Debenture Trust Co.*, 595 F.3d at 468.  Courts may not add or excise terms by construing the contract. *Id.*

## 2.  Permissibility of a Sale Under Section 10.3(d) of the Indentures

Hildene contends that the sale of the Portfolio Collateral breached the terms of the indentures because the indentures prohibit Wells Fargo from "sell[ing], transfer[ing], exchang[ing] or otherwise dispos[ing] of trust assets" except as expressly permitted by th[e] Indenture." (Indentures § 7.8(c); Am. Compl. at ¶¶ 35-36, 53-56.)  In particular, Hildene argues that although Defendants purported to proceed with the sale of the TruPS under Section 10.3(d) of the indentures, quoted above, this provision does not authorize the sale of Portfolio Collateral. (Am. Compl. at ¶¶ 89-90.)   Instead, Hildene maintains that Section 10.3(d) is better read as a veto provision that allows the Preferred Shareholders, who are the first to take losses under the indentures, to object to otherwise permissible sales by refusing to release the lien on the assets. (Am. Compl. ¶¶ 58-63.)   Wells Fargo argues that Section 10.3(d) unambiguously provided authority to the Preferred Shareholders to authorize the sale of the TruPS, and that the Court must therefore dismiss Hildene's claim based on this theory.

The Court cannot find that Section 10.3(d) of the indentures unambiguously authorized the sale of the TruPS.  Beginning with the plain text Section 10.3(d), although the statement that the Preferred Shareholders "may direct the Trustee to release from the lien of this Indenture such Portfolio Collateral in accordance with the terms of the Offer in each case against receipt of payment therefor" *could* be read as authorizing the sale of Portfolio Collateral, this is not the only reasonable interpretation of this provision.

In favor of Wells Fargo's proposed interpretation, Section 10.3(d) can be read as providing a mechanism for Wells Fargo to communicate an offer to the Preferred Shareholders,

who may then accept that offer on the Portfolio Collateral by releasing the lien in exchange for payment. Were Section 10.3(d) merely a veto provision, this language regarding releasing the lien "in accordance with the terms of the Offer and in receipt of payment therefor" would be unnecessary.

On the other hand, Wells Fargo's view of Section 10.3(d) is a cumbersome and counterintuitive way to draft a sales provision, providing authority to release the Portfolio Collateral from the lien, rather than simply authorizing the Preferred Shareholders to direct a sale. This lack of clarity is compounded by looking to other provisions in the indentures, including Section 12.2, which *does* unambiguously allow the Preferred Shareholders to direct a sale of the Portfolio Collateral under certain circumstances. That provision which, unlike Section 10.3(d), occurs in Article XII, headed "SALE OF PORTFOLIO COLLATERAL" allows 66-2/3% of the Preferred Shareholders to "direct . . . [Wells Fargo] to sell an item of Portfolio Collateral that is the subject of an Offer or call for redemption" to an alternative bidder if certain procedures are followed. (Indentures § 12.2.) That Section 10.3(d) neither falls in Article XII, governing the sale of Portfolio Collateral, nor contains the same sort of clear and unambiguous authorization to direct a sale undercuts Wells Fargo's position.[4] Moreover, Section 10.3(d) provides that it is "subject to" the provisions of Article XII, suggesting that it is Article XII that provides provisions for the sale of Portfolio Collateral, and Section 10.3(d) provides for procedures to release the lien "subject to" such a sale.

---

[4] Other provisions, such as Sections 5.4(a) and 9.6(a) likewise have clear language authorizing the Noteholders or Preferred Shareholders to direct sales, reinforcing Hildene's argument that Section 10.3(d)'s authorization to release Portfolio Collateral from the lien of the indentures is an incongruous way to draft a sale provision.

The Court concludes that Section 10.3(d) is ambiguous, and thus Hildene's breach of contract claim based on the alleged breach of this provision cannot be resolved at this stage of the proceedings.[5]

### 3. Permissibility of the Side Payments

Hildene also argues Wells Fargo breached the indentures by failing to collect and distribute the side payments made to the Preferred Shareholders (Am. Compl. at ¶¶ 64-67), relying on Section 10.3(e) of the indentures, which provides that "the Trustee shall credit all proceeds received by it from the disposition of Portfolio Collateral to the Collection Account."[6] Hildene argues the side payments are "from the disposition of the Portfolio Collateral" and thus should have been collected and distributed through the waterfall.

In support, Hildene cites the definitions of "Collateral Principal Collections" and "Collateral Interest Collections" in the indentures.  (Am. Compl. at ¶ 65; Opp. at 19).  In relevant part, "Collateral Principal Collections" and "Collateral Interest Collections" include "all payments" of principal and interest "with respect to the Portfolio Collateral" that are "received pursuant to a consent or similar solicitation" or "received in connection with a consent or solicitation." (Indentures at 9).  Hildene argues that the side payments were "received pursuant to a consent or similar solicitation" with respect to the Portfolio Collateral and therefore fall into these definitions

---

[5] As suggested by the Court's determination that Section 10.3(d) is ambiguous, there are also concerns with the proposed interpretation suggested by Hildene.  For example, as cumbersome as it is to interpret Section 10.3(d) as a sales provision, the text of Section 10.3(d) is at least an equally roundabout way of drafting a veto provision, giving the Preferred Shareholders positive authority to release the Portfolio Collateral from the lien rather than clear negative authority to prevent a transaction.  Moreover, it is not yet clear to the Court that Hildene has located a positive grant of sales authority over which Section 10.3(d) can be viewed as creating a veto power.

[6] Hildene also argues Wells Fargo was obligated to distribute such amounts under Section 11.1(b), which provides for the disbursement of the "waterfall" payments out of the Collection Account.  (Opp. at 20)  The crux of the dispute here, however, is whether Hildene was obligated to collect and credit the side payments, rather than the mechanics of how any funds it was required to collect should have been distributed.

such that Wells Fargo was required to collect and distribute them.  (Am. Compl. at ¶ 65; Opp. at 19).

Nothing that Hildene cites in the indentures suggests Wells Fargo was under an obligation to collect and distribute the side payments through the waterfall.  Section 10.1 of the indentures, which governs "[c]ollection of [m]oney" and which both Hildene and Wells Fargo point to, provides that Wells Fargo "may demand payment or delivery of, and shall receive and collect . . . all money and other property *payable to* or *receivable by* [Wells Fargo as trustee] pursuant to this Indenture." (Indenture § 10.1 (emphasis added)).  Likewise, Section 10.3(e) requires only that Wells Fargo "credit all proceeds *received by it* from the disposition of Portfolio Collateral to the Collection Account." (Indenture  10.3(e)(i) (emphasis added)).

Although Hildene's allegations in the Amended Complaint conclusorily assert that these payments should have been collected by Wells Fargo (Am. Compl. at ¶¶ 6, 10, 64-67), Hildene has not directed the Court to any provision that suggests that these side payments were payable to or receivable by Wells Fargo.  The side payments, according to Hildene's allegations, were payable directly to the Preferred Shareholders as an inducement to vote in favor of the transaction, not as compensation for the disposition of the TruPS or as  interest or principal from those assets.  (Am. Compl. at ¶¶ 6, 10, 64-67).  The definitions of "Collateral Principal Collections" and "Collateral Interest Collections" do not change this conclusion, as they simply pertain to whether payments that Wells Fargo receives are applied to principal or interest, and create no duties to collect payments made to the Preferred Shareholders.

Hildene argues that this approach leads to an absurd result, allowing FBR to bribe the Preferred Shareholders to let it repurchase its own securities at a discount.  (Hrg. Tr. at 33:21-34:1).  But Hildene has not been able to point to a provision in the indentures that authorizes or

requires Wells Fargo to collect the side payments, and the Court is not free to add terms for which the parties did not contract. *Id.* Hildene's breach of contract claim relying on this theory fails as a matter of law.

### 4. Implied Covenant of Good Faith and Fair Dealing

Hildene also argues that Wells Fargo breached the implied covenant of good faith and fair dealing in the indentures by (1) failing to collect and distribute the side payments; (2) failing to take into account whether FBR's offer was in the best interest of the CDOs and permitted by the indentures; (3) failing to notify the Noteholders of FBR's offer and the proposed sales; (4) failing to file an interpleader; and (5) forwarding FBR's offer to the Preferred Shareholders while unsure of its duties. (Am. Compl. at ¶ 93). Wells Fargo responds that Section 6.1(a)(1) of the indentures precludes this claim because it provides that "the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee." (Indenture § 6.1)

Hildene has not stated a proper claim for breach of the implied covenant of good faith and fair dealing. Although "[e]very contract contains an implied covenant of good faith and fair dealing" that precludes a party to a contract from taking an action that would destroy the rights of another party to receive the fruits of the bargain, *Combustion Eng'g, Inc. v. Imetal*, 235 F. Supp. 2d 265, 270 (S.D.N.Y. 2002); *see State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004); *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002), this covenant does not impose obligations beyond those intended and stated in the language of the contract. *Combustion Eng'g, Inc.*, 235 F. Supp. 2d at 270; *see also State St. Bank & Trust Co.*, 374 F.3d at 170. In particular, a court cannot imply a covenant inconsistent with the terms expressly set forth in the contract, and a court cannot employ an implied covenant to

13

supply additional terms for which the parties did not bargain. *See Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 991-93 (S.D.N.Y. 1989); *see also State St. Bank & Trust Co.,* 374 F.3d at 170.

Hildene's claim based on an implied covenant of good faith and fair dealing is an impermissible request that the Court impose broad obligations on Wells Fargo found nowhere in the text of the indentures. *See State St. Bank & Trust Co.*, 374 F.3d at 170; *Hartford Fire Ins. Co. v. Federated Dep't Stores*, Inc., 723 F. Supp. 976, 991-93 (S.D.N.Y. 1989) (refusing to imply a term in an indenture under the implied covenant of good faith and fair dealing because it would 'add a substantive provision for which the parties did not bargain); *Fesseha v. TD Waterhouse Investor Servs.*, 761 N.Y.S.2d 22, 23 (N.Y. App. Div. 1st Dep't 2003); *Wilmington Trust Co. v. Solutia, Inc. (In re Solutia, Inc.)*, No. 03-17949, 2007 Bankr. LEXIS 1576, at *37-47 (Bankr. S.D.N.Y. May 1, 2007). Moreover, Section 6.1 of the indentures strongly suggests an intent to limit Wells Fargo's obligations to those made explicit in the indentures. Although under the implied covenant Wells Fargo would have to perform those limited duties in good faith, Hildene's request goes far beyond this.

Finally, as discussed in greater detail below, under New York law and as confirmed by the terms of the indentures, Wells Fargo did not owe broad fiduciary duties to the Noteholders. Hildene's argument that the Court should impose broad duties under an implied covenant of good faith is nothing more than an attempt at an end-run around these limited duties and cannot be allowed. *Cf. Ellington Credit Fund, LTD. v. Select Portfolio Servicing, Inc.*, No. 08-cv-2437, 2011 U.S. Dist. LEXIS 139134, at *56 (S.D.N.Y. Dec. 2, 2011) (noting that under New York law, a breach of fiduciary duty that is merely duplicative of a breach of contract claim cannot stand).

14

### 5.   Contractual Defenses

Finally, Wells Fargo attempts to rely on an assortment of provisions in the indentures that contain clauses releasing Wells Fargo from liability or protecting it from taking certain actions to attempt to defeat Hildene's claims.  (Wells MTD at 17.)  The Court finds that none of these provisions suffice, at this juncture, to require dismissal of Hildene's claims.

First, Wells Fargo relies on Section 6.3(a), which provides that "the Trustee may rely and shall be protected in acting or refraining from acting upon any . . . direction, consent, . . . or other paper document . . . believed by it to be genuine and to have been signed or presented by the proper party or parties." Under New York law, exculpatory clauses are strictly construed against the party attempting to rely on them. *See Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1008 (2d Cir. 1991); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, No. 09-cv-3255, 2012 U.S. Dist. LEXIS 14974, 67 (S.D.N.Y. Feb. 6, 2012); *Travelers Cas. & Sur. Co. v. Dormitory Auth.*, 735 F. Supp. 2d 42, 58 (S.D.N.Y. 2010); *HealthExtras, Inc. v. SG Cowen Secs. Corp.*, No. 02-cv-9613, 2004 U.S. Dist. LEXIS 698, at *5 (S.D.N.Y. Jan. 16, 2004). Section 6.3(a) can reasonably be read not as a general release from liability for actions in which Wells Fargo relies on documents, but rather as allowing it to rely on its belief of the genuineness of documents presented to it and its belief that those documents had been executed by the proper parties.  This is particularly apparent when Section 6.3(a) is compared to the other provisions in Article VI which provide for more general releases of liability, such as Section 6.3(k); those which specifically do not release Wells Fargo from liability for negligence, such as Section 6.1(c); and those that otherwise address reliance on the contents of documents, such as Section 6.1(a)(2).  These provisions would be unnecessary or incongruous if Section 6.3(a) were read as a general release from liability.  As such, the Court cannot, at the pleading stage, view Section

15

6.3(a) as an unambiguous release of all liability whenever Wells Fargo takes an action relying on a document.

Hildene also attempts to rely on Section 6.3(k), arguing that this provision excuses it from liability for actions taken in good faith that it reasonably believed were authorized. However, Wells Fargo's good faith and reasonable beliefs are questions of fact not appropriate for resolution as a matter of law.

Finally, Hildene relies on Section 6.3(m) of the Soloso Indentures, which provide that "the Trustee shall not be responsible or liable for the . . . acts or omissions of either Co-Issuer [Soloso CDO 2005-1 Ltd. and Soloso CDO 2005-1 Corp.]." This provision does not appear in the Tropic Indentures, and thus cannot excuse liability for transactions governed by those indentures. Moreover, Wells Fargo's liability is not merely premised on the acts of the CDOs, but also on its role and acts as trustee and party to the indentures. Thus, Section 6.3(m) does not provide a shield for Wells Fargo.

## B. Tortious Interference With Contract

In Count VI of its Amended Complaint, Hildene alleges that FBR tortiously interfered with the indentures, which are valid and binding contracts between Wells Fargo and the CDOs to which Hildene was an intended beneficiary. (Am. Compl. ¶¶ 128-143). FBR responds that there was no underlying breach of the contract for the reasons discussed above, and therefore the tortious interference claim must fail. (FBR MTD at 6); *Law Debenture Trust Co.*, 595 F.3d at 472; *Robins v. Max Mara, U.S.A., Inc.*, 923 F. Supp. 460, 468 (S.D.N.Y. 1996) ("In order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party.") To the extent that the Court has rejected

certain of Hildene's claims for breach of contract, the Court similarly dismisses Hildene's tortious interference claims that are based on the same theories of breach.

FBR also argues that because it has an economic interest in the indentures, Hildene must meet a higher pleading standard and allege malice, criminality, or fraud underlying FBR's actions and that Hildene has not done so.  (FBR MTD at 9).  Hildene counters that it need not address the economic interest defense at the pleadings stage and that, regardless, it has sufficiently alleged malice, criminality, or fraud.  (Hildene Opp. at 31).

The Court will not dismiss Hildene's tortious interference claims at this juncture based on the economic interest defense.  Several courts in the Second Circuit have refused to apply the economic interest defense at the pleading stage to dismiss complaints for tortious interference with contract, explaining that the facts of the pleadings were not sufficiently developed to show entitlement to the defense.  *See, e.g.*, *Reach Music Publ., Inc. v. Warner/Chappell Music, Inc.*, No. 09-cv-5580, 2011 U.S. Dist. LEXIS 100969, at *20-21 (S.D.N.Y. Sept. 7, 2011) ("A motion pursuant to Rule 12(b)(6) addresses the sufficiency of the pleadings; the facts upon which the Reach Parties premise this defense are not developed in the pleadings"); *Armstrong Pump, Inc. v. Hartman*, 745 F. Supp. 2d 227, 239-40 (W.D.N.Y. 2010) (refusing to dismiss a tortious interference claim because "at the pleading stage . . . dismissal would be appropriate only if [plaintiff]'s fact allegations establish, as a matter of law, that [defendant's] actions were taken to protect an economic interest"); *New Yuen Fat Garments Factory Ltd. v. August Silk, Inc.*, No. 07-cv-8304, 2009 U.S. Dist. LEXIS 45857, 18-20 (S.D.N.Y. June 1, 2009) ("The Court is thus not persuaded at this stage that, as a matter of law, August Silk can avail itself of the economic interest defense . . . ").

Particularly on-point is *Howe v. Bank of New York Mellon*, 783 F. Supp. 2d 466, 483 (S.D.N.Y. 2011), a case involving essentially the same underlying fact pattern—repurchase of trust preferred securities for less than face value and in alleged violation of the governing indenture. In that case, the court held that there were material disputes of fact that precluded summary judgment as to whether the Bimini, the entity that repurchased the securities, had a sufficient economic interest to successfully invoke the economic interest defense. *See id.* In particular, the parties disputed whether Bimini was facing financial troubles significant enough to require the repurchase of the securities to avoid bankruptcy. *See id.* Bearing in mind the parallels between *Howe* and the present case, it is not the case that FBR is entitled to an economic interest defense as a matter of law.

### C. Unjust Enrichment

As Count VIII of its Amended Complaint, Hildene asserts claims for unjust enrichment against FBR and the Preferred Shareholders based the sale of the TruPS to FBR.  FBR moves to dismiss this claim on the grounds that a claim for unjust enrichment under New York law cannot be sustained, even against a nonsignatory to the indentures like FBR, if there is an express contract governing the subject matter at issue.[7]  (FBR MTD at 9-10).  FBR argues that the unjust enrichment claim derives solely from the sale of the assets to FBR in alleged violation of the indentures, and therefore must be dismissed.

FBR appears to be correct that a claim of unjust enrichment cannot be sustained if a valid contract governs the relevant subject matter, even against a non-signatory to the contract. *See Ellington Credit Fund.*, No. 08-cv-2437, 2011 U.S. Dist. LEXIS 139134, at *81-86 (S.D.N.Y.

---

[7] FBR's papers are inconsistent as to whether they believe Hildene or FBR is a nonsignatory. (FBR MTD at 10; FBR Reply at 13).  Hildene is clearly arguing that FBR is not a party to the contract. (Opp. at 31).

Dec. 2, 2011) (third party allegedly enriched as a result of breach of contract); *Viable Mktg. Corp. v. Intermark Communs., Inc.*, No. 09-cv-1500, 2011 U.S. Dist. LEXIS 96648, at *7-8 (E.D.N.Y. Aug. 25, 2011); *Network Enters., Inc. v. Reality Racing, Inc.*, No. 09-cv-4664, 2010 U.S. Dist. LEXIS 89598, at *20 (S.D.N.Y. Aug. 24, 2010) ("Today, the existence of a valid and binding contract governing the subject matter at issue in a particular case *does* act to preclude a claim for unjust enrichment even against a third party non-signatory to the agreement." (quotation marks omitted, emphasis original)); *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 196-97 (S.D.N.Y. 2009).  However, based on the Court's analysis above, there is substantial question as to whether the indentures in fact govern the subject matter of Hildene's unjust enrichment claim.  As discussed above in assessing Hildene's claim that Wells Fargo was required to collect and distribute the side payments, it does not appear that the indentures contemplated that a purchaser would offer side payments to induce the Preferred Shareholders to sell Portfolio Collateral.  Indeed, Wells Fargo and FBR's argument in response to Hildene's breach of contract claim on this point is that there is no provision of the indentures addressing such side payments.

      If the contract does not cover the dispute in issue, a plaintiff may proceed on a theory of quantum meruit as well as contract.  *Vertex Constr. Corp. v. T.F.J. Fitness L.L.C.*, No. 10-cv-683, 2011 U.S. Dist. LEXIS 135453, at *10-11 (E.D.N.Y. Nov. 23, 2011); *Sabilia v. Richmond*, 11-cv-739, 2011 U.S. Dist. LEXIS 152228, at *94-96 (S.D.N.Y. Oct. 26, 2011); *Am. Tel. & Util. Consultants, Inc. v. Beth Isr. Med. Ctr.*, 307 A.D.2d 834, 835 (N.Y. App. Div. 1st Dep't 2003). Indeed, the district court took this approach in *Howe*, which allowed a claim for unjust enrichment to go forward based on the premise that the relevant agreements did not set forth the rights and obligations of the plaintiff with respect to the third-party purchaser.  *See Howe*, 783 F.

19

Supp. 2d at 485-86 (S.D.N.Y. 2011). Moreover, "because it is difficult to determine the validity or scope of the contract at the pleading stage, courts routinely reject arguments like [FBR's] as premature." *Vertex Constr. Corp.*, No. 10-cv-683, 2011 U.S. Dist. LEXIS 135453, at *11; *see also Sabilia*, 11-cv-739, 2011 U.S. Dist. LEXIS 152228, at *96; (explaining that New York permits the alternative pleading of breach of contract and unjust enrichment claims, and the survival of both claims at the motion to dismiss stage, where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue); *Am. Tel. & Util. Consultants, Inc.*, 307 A.D.2d at 835 ("[I]n view of the bona fide dispute over whether, as plaintiff contends and defendant denies, the High Tension Tariff and Power for Jobs programs are within the scope of the parties' contracts, dismissal of plaintiff's unjust enrichment claim with respect to those programs was premature.").

The Court will not dismiss Hildene's unjust enrichment claim as subsumed by its breach of contract claim. In short, given the Court's determination that the indentures do not cover the side payments made to induce the Preferred Shareholders to accept FBR's offer, the Court cannot at this point say that the indentures govern the subject matter of Hildene's unjust enrichment claim.

## IV.   CLAIMS FOR BREACH OF FIDUCIARY DUTY

### A. Breach of Fiduciary Duty by Wells Fargo

Count IV of Hildene's Amended Complaint asserts that Wells Fargo breached its fiduciary duties to the Noteholders to act for their benefit, and "to act prudently and with a high degree of care in exercising its duties and obligations under the Indentures" based on Hildene's high level of trust reposed in Wells Fargo to manage the CDO. (Am. Compl. at ¶ 117). Hildene locates the source of these fiduciary duties in Section 6.17 of the indentures, entitled "Fiduciary for

Noteholders," which provides that "the Delivery of any item of Collateral to the Trustee is to the Trustee as Trustee for the Noteholders" and that "the possession by the Trustee of any item of Collateral . . . are undertaken by the Trustee in its capacity as Trustee for the Noteholders." (Indentures § 6.17.)  Hildene alleges a number of reasons it believes that Wells Fargo breached this duty, which in essence amount to allegations that Wells Fargo should not have allowed the sale of the TruPS or forwarded FBR's offer to the Preferred Shareholders, should have collected and distributed the side payments to the Preferred Shareholders, and was conflicted by serving as trustee to FBR Capital Trusts. (Am. Compl. at ¶ 119.)

For the most part, Hildene's claims for breach of fiduciary duty fail as a matter of law. Under New York law, absent an event of default, indenture trustees are generally subject only to those limited duties expressly set forth in the indentures. *See Elliott Assoc. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71-72 (2d Cir. 1988) (explaining that it is well established under both federal and state common law that the pre-default duties of an indenture trustee are strictly defined and limited to the terms of the indentures and that the Second Circuit has consistently rejected the imposition of additional duties on the trustee.); *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985); *Ellington Credit Fund*, No. 08-cv-2437, 2011 U.S. Dist. LEXIS 139134, at *50.  Hildene's argument that Section 6.17 was intended to impose broad fiduciary duties on Wells Fargo is directly contrary to this well-established principle.

Moreover, Hildene's claim that Section 6.17 imposes broad pre-default fiduciary duties on the trustee is contrary to the terms of the indentures. First, Section 6.17 provides only that Wells Fargo is to act as a custodian with respect to the "possession . . . endorsement . . . or registration" of the Portfolio Collateral.  (Indentures § 6.17).  Wells Fargo fiduciary capacity in these limited tasks cannot be read to imply the sort of unbounded fiduciary duties Hildene now asserts.

21

Second, comparing Section 6.17 to Section 6.1(b), which provides that in "an Event of Default . . . the Trustee shall . . . exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances," (Indentures § 6.1(b)), further shows why Hildene's reading of Section 6.17 is unacceptable.  Section 6.1(b) demonstrates that the drafters of the indentures knew how to impose broad fiduciary duties and provided, consistent with New York law, that these duties arise in an Event of Default.  In addition to the absence of any such clear language in Section 6.17 imposing broad fiduciary duties, Section 6.1(b) would be largely meaningless if Wells Fargo was under a general fiduciary duty to "act prudently and with a high degree of care" as Hildene alleges, even prior to an Event of Default.  Finally, the absence of a general fiduciary duty is also consistent with Section 6.1's disclaimer of any implied covenants or obligations not expressly provided for in the indentures. *See Meckel*, 758 F.2d 811, 816 (2d Cir. 1985) (noting that a paragraph of the indentures provided that that "the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenant or obligation shall be read into this Indenture against the Trustee").

The only remaining question is whether Hildene has sufficiently alleged that Wells Fargo breached a duty to avoid conflicts of interest—a duty that New York courts have applied to indenture trustees notwithstanding their limited pre-default fiduciary duties. *See Elliott Assoc.*, 838 F.2d at 71 (despite limits on duties of indenture trustees pre-default, "the trustee must nevertheless refrain from engaging in conflicts of interest"); *Ellington Credit Fund*, No. 08-c v-2437, 2011 U.S. Dist. LEXIS 139134, at *50 (noting duty to avoid conflicts of interest); *Howe*, 783 F. Supp. 2d at 483.  The Second Circuit has, for example, found a duty of the trustee not to enrich itself at the expense of trust beneficiaries, as this constitutes a conflict of interest. *Elliott*

22

*Assoc.*, 838 F.2d at 72-73 (citing *Dabney v. Chase National Bank*, 196 F.2d 668 (2d Cir. 1952), *as suppl'd*, 201 F.2d 635).

Hildene alleges that Wells Fargo had a conflict of interest in this transaction because it is both the indenture trustee and the trustee under the declarations that created the FBR TruPS that were the subject of the allegedly unlawful transaction, and thus stood on both sides of the sale of the Portfolio Collateral.  (Am. Compl. at ¶¶ 2, 4, 6, 10; Opp. at 27).  Wells Fargo responds that its pre-default duties under the indentures were purely ministerial (Hrg. Tr. at 8-9; Wells MTD at 16), and that Wells Fargo could not have a conflict unless it "personally benefitted" from the sale of the TruPS (Wells Reply at 8).

Hildene's allegations of conflict are sufficient to allow this aspect of its claim for breach of fiduciary duty to survive Wells Fargo's motion to dismiss.  At the pleading stage, Hildene must merely allege a claim that is "plausible on its face."  *Iqbal*, 556 U.S. at 678.  Hildene has alleged that in other cases involving similar transactions Wells Fargo has filed an interpleader rather than proceed with the transaction, suggesting that there may have been actions it could have taken beyond simply forwarding FBR's offer to the Preferred Shareholders.  (*See, e.g.*, Am. Compl. at ¶ 14).  In addition, the nature of the conflict that Hildene alleges, with Wells Fargo standing on both sides of the transaction at issue, allows the inference that Wells Fargo may have stood to benefit from the transaction.  Hildene has alleged for example that Wells Fargo had a "dut[y] to maximize returns to the FBR Capital Trusts." (Am. Compl. at ¶ 10).

The Court therefore grants the motion to dismiss insofar as Hildene alleges that Wells Fargo had broad fiduciary duties not provided for by the indentures, but denies the motion as to Hildene's theory that Wells Fargo had a conflict of interest regarding the disputed transaction.

### B.  Aiding and Abetting Breach of Fiduciary Duty

Hildene has also asserted a claim for aiding and abetting breach of fiduciary duty against FBR as Count X of its Amended Complaint. FBR argues that the claim for aiding and abetting a breach of fiduciary duty should be dismissed for three reasons: (1) Wells Fargo did not owe any fiduciary duty; (2) Hildene has failed to allege a breach; and (3) the breach of fiduciary duty claim is duplicative of Hildene's breach of contract claims. All of these arguments are disposed of by the previous section. Although certain of the alleged fiduciary duties are insufficient as a matter of law, at least the duty to avoid conflicts of interest survives a motion to dismiss. Likewise, Hildene has alleged a breach of that duty. Finally, that duty does not spring from the terms of the contract but rather from Wells Fargo's status as trustee. As such, the motion to dismiss Count X is denied as to Hildene's allegations that Wells Fargo had conflict of interest, but is otherwise granted.

## V.   RICO CLAIMS

Hildene brings RICO and RICO conspiracy claims against FBR Inc. and Wells Fargo, alleging that the repurchase of the TruPS was part of a fraudulent scheme to extinguish $300 million of FBR Inc.'s debt. (Am. Compl. ¶¶ 168-169, 173, 182). Hildene alleges (1) commercial bribery and (2) mail and wire fraud as the predicate acts of racketeering activity underlying the RICO claim. (Am. Compl. at ¶¶ 191-198). The commercial bribery allegations are based on the side payments Hildene has made to the Preferred Shareholders; the mail and wire fraud allegations assert that the FBR RICO enterprise fraudulently represented that the sale of the TruPS was permissible. (Am. Compl. at ¶¶ 191-198). Although Wells Fargo notes numerous flaws in Hildene's RICO allegations, the Court need address only the issue of Hildene's standing to pursue its RICO claims.

24

A cause of action does not accrue under RICO until the amount of damages becomes clear and definite. *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 136 (2d Cir. 2003); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994); *see also Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Mkts.*, LLC, 347 Fed. Appx. 711, 712-13 (2d Cir. 2009) (unpublished). If the damages are not yet clear and definite, a plaintiff lacks statutory standing to pursue a RICO claim. *See First Nationwide Bank*, 27 F.3d at 768; *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 236-37 (E.D.N.Y. 2010). Courts in this circuit have often dismissed RICO claims as premature on these grounds. *See, e.g.*, *Motorola Credit Corp.*, 322 F.3d at 137; *First Nationwide Bank*, 27 F.3d at 769.

Hildene has not alleged it has suffered a clear and definite RICO injury for two reasons. First, as Wells Fargo argues, Hildene's allegations do not establish that it has actually been harmed by the sale of the TruPS. Under the indentures, Hildene is entitled to payment of principal and interest on the notes it holds. Although the sale of the TruPS has decreased the amount of collateral generating income for the Noteholders, Hildene has not alleged that there has been a payment default or a shortfall of funds generated by the CDOs such that Hildene has not received funds to which it is entitled.[8] Hildene did not dispute these points at argument or in its opposition papers and, in fact, conceded that "[t]here is not a payment default yet." (4/25/12 Tr. at 25:15). Moreover, as Defendants pointed out at argument, even if the CDOs were to fail to make payments due to Hildene, Hildene still might not suffer an injury attributable to the sale of the TruPS. In the event of a sufficiently large shortfall of income, it could be the case that

---

[8] The same point is true as to the side payments made to the Preferred Shareholders—despite Hildene's claims that it has been injured because these payments properly belonged to the CDOs and should have been collected and distributed to Hildene and the other Noteholders, Hildene has not alleged that it has not been paid its due under the indentures even absent collection of these funds.

25

regardless of whether the TruPS were still part of the Portfolio Collateral, there would be insufficient funds to pay Hildene after investors higher in the waterfall are paid. Put differently, there is a narrow window in which Hildene might suffer clear and definite damages due to the sale of the TruPS—the CDOs must suffer losses large enough to reduce the funds that would be paid to Hildene under the waterfall, but not so large that the waterfall would run dry before any money generated by the TruPS would conceivably reach Hildene. Hildene's allegations do not establish such damages.

Second, Hildene's RICO claim is premature because Hildene has not been frustrated in pursuing its other remedies that might reduce or eliminate the alleged injury, a prerequisite to asserting a RICO claim. *See Motorola Credit Corp.*, 322 F.3d at 136-37; *First Nationwide Bank*, 27 F.3d at 768 ("[A] plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been frustrated."); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988) ("[A]t this time, it is impossible to determine the amount of damages that would be necessary to make plaintiff whole, because it is not known whether some or all of the fraudulently transferred funds will be recovered by the corporation."); *Kilkenny v. Law Office of Cushner & Garvey, L.L.P.*, No. 08-cv-588, 2012 U.S. Dist. LEXIS 64653, at *33-34 (S.D.N.Y. May 7, 2012); *DeSilva v. N. Shore-Long Island Jewish Health Sys.*, 770 F. Supp. 2d 497, 521-22 (E.D.N.Y. 2011). For example, in *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 398 (S.D.N.Y. 2000), the court dismissed a RICO claim because the "[p]laintiffs' 118 separate State law claims sounding in breach of contract, breach of fiduciary duty, negligence, gross negligence, constructive trust, conversion and fraud are the very claims that Plaintiffs must pursue in order to determine whether or not they suffered any injury compensable under RICO." *See also DLJ Mortg. Capital,*

26

*Inc.*, 726 F. Supp. 2d at 236-39. Here, as demonstrated by the numerous other claims Hildene has raised in this litigation through which it may recoup its losses, Hildene's RICO damages are not yet clear and definite and no RICO cause of action has yet accrued.

Hildene's RICO-related claims, Counts XII, XIII, XIV, and XV of Hildene's Amended Complaint, must be dismissed. *See Kilkenny*, 2012 U.S. Dist. LEXIS 64653, at *33-34 (S.D.N.Y. May 7, 2012) (explaining that RICO conspiracy claims cannot be stated in the absence of a substantive RICO claim, which claim the court had dismissed for failure to properly allege damages). Because these claims have not yet accrued, however, this dismissal is without prejudice to Hildene's rights to assert such claims if damages become clear and definite. *See, e.g.*, *Bankers Trust Co.*, 859 F.2d at 1106.

## CONCLUSION

Counts II, III, V, VII, IX, and XI through XV are dismissed in their entirety, as specified above. Counts I, IV, VI, VIII, and X are not dismissed in their entirety, although some of Hildene's theories on these claims fail as a matter of law.

Dated: August 13, 2012
New York, New York

_____
ALISON J. NATHAN
United States District Judge

27